## Cotton v. The State, 31 Miss. Rep., 504.

### HOMICIDE.

A man who from common rumor has formed an opinion as to the guilt or innocence of a party indicted for murder, which it would require testimony to remove, but who on his oath states that he feels as free to act in the matter as if he had never heard of the case, is incompetent. Nelms v. State, 13 S. & M., 500, cited and approved as authority.

A court in this class of cases should never give the jury any instructions which, even by remote construction or bare possibility, may limit or cramp the free action of the jury in considering the evidence before them.

To excuse one person in taking the life of another, on a plea of self-defense, there must have existed at the time of the killing a reasonable ground to apprehend a design on the part of the deceased to commit a felony or some great personal injury upon the accused, and at the same time immediate danger of its accomplishment. The reasonable ground to apprehend the design, *and* the imminent danger, must both exist, and the homicide must have occurred, all at one and the same time.

As a means of determining the fact of the reasonable apprehension of design and

danger, the peculiar character of the hostile party is as much a fact for the consideration of the jury as any other fact in issue.

But it may occur, in an extreme case, that although there be no actual danger at the moment, the danger may be increased by delay, or by allowing the hostile party to escape and arm himself; and hence upon this subject a court can, with safety or propriety, lay down only general, and not universal, rules.

If incorrect instructions be asked, the court may modify or correct them before giving them to the jury. But if correct, and asked, they should be given without modification or amendment.

Error to the circuit court of Yazoo county. HENRY, J.

John Cotton, the plaintiff in error, was indicted in the circuit court of Yazoo county, for the murder of one John Smith. At the February term, A. D. 1854, of said court, he was tried and convicted of murder, and sentence of death pronounced against him, which judgment this court, on a writ of error, reversed, and awarded the prisoner a new trial. At the November term, A. D. 1855, of said court, the prisoner was again tried and convicted, and judgment of death was pronounced against him.

From this last judgment he prosecuted this writ of error.

The first, second and third bills of exception taken by the prisoner on his trial, relate to the action of the circuit court in overruling his challenges for cause, to three jurors, and requiring him to accept or peremptorily challenge them. By the first, it appeared that when the name of James Blundell, one of the special *venire*, was called, he was accepted as a juror by the state and tendered to the prisoner. Blundell being interrogated by the prisoner's counsel, answered that he had formed an opinion in reference to the guilt or innocence of the accused; that his opinion was formed from having heard persons speak of the matter; that he did not know that he had ever spoken with any of the witnesses on the subject, and that the opinion that he had formed was such that it would require evidence to remove it. Whereupon the prisoner challenged Blundell for cause. The court then asked Blundell "if his opinion was fixed, or that it was formed from rumor?" He replied that it was formed from rumor. The court then asked him, "if his mind was free to act on the testimony as if he had heard nothing about the case?" He replied "that it was." The court then overruled the prisoner's challenge for cause, and tendered Blundell to him as a

competent juror.  The prisoner then challenged the juror per-
emptorily, and excepted to the ruling of the court.

2. In substance the same questions were propounded by the
prisoner and the court to James Sherrod, another one of the
special *venire*, who had been accepted by the state and tendered
to the prisoner, and the same answers were given.  The court
ruled as in the case of Blundell, and the prisoner challenged
Sherrod peremptorily, and excepted.

3. The same course was pursued in reference to J. J. Billing-
ton, who made the same answer as the other two ; and further,
he stated in answer to an interrogatory propounded by the
court, that his opinion was not fixed, but hypothetical, and that
he could render an impartial verdict on the evidence.

The evidence for the state was in substance as follows :

Greenberry Anderson stated, that in July, A. D. 1852, he, with
several others, was in the store of one Frawley, in Yazoo city,
in company with John Smith, the deceased; that the prisoner
came in the room and he and Smith exchanged salutations.  Pris-
oner then told Smith that he wanted to speak with him, to
which Smith replied, " certainly."  Prisoner then walked out,
and Smith followed ; both turned down the street and went
about sixteen feet from the door of the store-room of Frawley.
Witness soon after heard Smith say, " I did not say it."  Cotton
replied, " that he believed Smith was a liar, and did say it, and
that he could whip him."  Smith then said, " If you think so,
pitch in."  These words were spoken in an angry manner, and
witness thinking there was about to be a fight, went out into the
street, and immediately heard a blow struck by one the parties,
but he could not tell which one of them struck it.  Smith was
standing on the sidewalk, with his back toward the houses, and
the prisoner was walking backward across the street, in a direc-
tion from Smith.  Witness then approached to within a few feet
of the parties, on a line which would have led him between
them ; he then stopped ; he then heard the prisoner say three
several times, " draw it."  Witness looked at Smith, " but did
not see him draw any thing."  While prisoner was saying " draw
it," witness saw him pull a pistol out of his pocket and shoot
Smith.  This was about dark, and in Yazoo county, where Smith

died on the same night. Witness went up to Smith after he was shot and carried him across the street and laid him down in a house; he saw no weapons on him. Smith had blood on his mouth, which looked as if he had been struck.

Upon cross-examination, witness stated that it was very dark that night; there was no moon, and it was a little cloudy; that it was so dark that he could not distinguish Cotton except by his voice; that he could not see what Cotton was drawing from his pocket until the pistol was fired; that he was nearer to Cotton than to Smith; that Smith was standing with his left side toward witness, and that he could not see his right hand, and did not know what he was doing with it; that Cotton was going backwards until he fired; that it was not more than two or three minutes from the time Cotton and Smith left the store, until the pistol was fired.

Dr. Leake, for the state, described the character of the wound of Smith, and stated that it caused his death.

This was all the evidence; the prisoner offered none.

The second instruction given on behalf of the state, was as follows:

That if the jury believes from the evidence that the accused killed Smith, the deceased, and no accompanying circumstances appear in the evidence to excuse the act, the law presumes the killing was done maliciously, and that they will find him guilty of murder.

The other instructions given on behalf of the state, which are necessary to be noticed, are fully set out in the opinion of the court.

The first, second and third instructions given on behalf of the prisoner, with the modifications of the court, are as follows:

1. That unless the jury believe from the evidence that the prisoner killed John Smith from a premeditated design formed beforehand to effect his death, or the death of some other person, they cannot find him guilty of murder.

The court refused to give this instruction as asked, but added to it the words, " but if it was premeditated the law does not regard how short beforehand the time was," and with this addition, gave it.

2. That to kill a human being with a premeditated design, the mind must have acted in regard to the killing before the killing was committed; and the mind must have settled down, resolved and determined to kill and murder; and that the killing was done with a deliberate mind and formed design of so doing.

Which the court refused to give as asked, but added thereto the same modification as the one to the first instruction, and then gave it.

3. That if the jury believed that Cotton killed Smith on a sudden quarrel, without a premeditated and formed design so to do, they must not find him guilty of murder.

To which the court added, "unless he sought the quarrel and used a deadly weapon;" and, with this addition, gave it.

To all which modifications and additions, so made by the court, the prisoner excepted.

Other instructions were asked by the prisoner, and given by the court, but it is unnecessary to set them out.

*W. E. Pugh*, for plaintiff in error.

Filed an elaborate brief, and cited and commented on the following authorities:

On the point that the court erred in overruling the challenge for cause, of prisoner, to Blundell, Sherrod and Billington. Sam v. The State, 13 S. & M., 189; Nelms v. State, ib., 500.

On the law of homicide. Whart. Am. C. L., 393, note; Shorter v. People, 2 Comstock R., 197; 27 Miss. R., 379; 2 Stark. Ev., 46; Roscoe Crim. L., 290; 1 Bay R., 351; 2 Wend. R., 497; 23 Miss. R., 322.

On the point that the grand jury was defective. M'Quillen v. The State, 8 S. & M., 597; 2 Pick. R. 550; 12 S. & M., 68; 23 Miss. R. 580.

*D. C. Glenn*, attorney general.

FISHER, J.:

The prisoner having been convicted at the last November term of the circuit court of Yazoo county, of the crime of murder, has brought this case for revision into court.

The errors assigned relate:—First. To the action of the court

in empanelling the jury by whom the prisoner was tried. Second. To the instructions given on behalf of the state; to certain modifications of the instructions asked on behalf of the prisoner; and, Third. To the action of the court in overruling the motion in arrest of judgment. These several errors will be noticed in the order in which they have been assigned by counsel.

As to the first assignment. A juror being tendered by the state to the prisoner, was asked if he had formed or expressed an opinion as to his guilt or innocence. Answering that he had formed such opinion, the juror proceeded further to state that his opinion thus formed, was such that it would "require testimony to remove it," whereupon the prisoner's counsel challenged the juror for cause; but the court proceeding further to interrogate him, the juror stated that his opinion was formed from rumor, and that he felt as free to act in the matter, as if he had heard nothing about the case; thereupon the court held the juror competent, and forced the prisoner either to accept the juror, or to challenge him peremptorily.

The same state of facts apply to two other jurors tendered by the state to the prisoner. This point underwent elaborate consideration by this court in the case of Nelms v. The State, 13 S. & M., 500; and the facts of that case, if not identical, are certainly not stronger than the facts of the case at bar. The juror in that case was held incompetent; and recognizing that decision as authority, we are compelled to hold that the jurors tendered to the prisoner were incompetent, and should not have been forced upon him by the court.[1]

[1] Wharton Am. Cr. Law, 3004; King v. State, 5 How., 730; State v. Johnson, 1 Walker, 392; Nelms v. State, 13 S. & M., 500; People v. Mahony, 18 Cal., 180; Burtine v. State, 18 Ga., 534; Rice v. State, 7 Ind., 332; Bradford v. State, 15 ib., 347; McGregg v. State, 4 Blackf., 101; Romaine v. State, 7 Ind., 63; Morgan v. Stevenson, 6 Ind., 169; State v. Sater, 8 Iowa, 420; Commonwealth v. Webster, 5 Cush., 295; Commonwealth v. Gee, 6 ib., 174; Baldwin v. State, 12 Mo., 223.

GENERAL RULE AS TO PREADJUDICATION OF JURORS.

A previous opinion formed on rumor does not disqualify a juror; but one formed on hearing information from a witness, either directly or through another person, does render a juror incompetent. Nelms v. State, 13 S. & M., 500; and see The State v. Johnson, Walker R., 392; King v. State, 5 How., 730. If upon examination a juror is found to have formed an opinion as to the issue to be passed upon, he may be set aside before either party has an opportunity to challenge him. Marsh v. State, 30 Miss., 627; and see Sam's case, *supra.*

It is ground for a new trial, that, after a juror was summoned, and before trial, he said he did not see how he could clear the defendant should he be on the jury, but

Next, as to the instructions of the court. It is said that the second instruction limited the investigation of the jury to the crime of murder or to the defense of excusable homicide, and they were not permitted to take into consideration the defense of manslaughter, which, so far as the crime of murder is concerned, may be regarded as a defense to the prisoner. The instruction was, no doubt, intended to leave the jury free to investigate, according to the testimony, the degree of crime of which the accused, if guilty at all, was really guilty; but it must be admitted at the same time that the instruction, if taken strictly according to its language, might warrant the construction given to it by counsel, and might have confined the jury to an investigation too limited. The jury, no doubt, without the instruction, would have clearly understood their duty, and the question is, whether it tended to cramp their action? In answering this question, we think it barely possible that the instruction could have produced such an effect. Our conclusion upon this point, therefore, is that, while the instruction was wholly unnecessary, and while we are of opinion that it did not in the least influence the jury, and we would not, therefore, reverse the judgment if this were the only error, yet the safer rule, unquestionably, is that, where the court undertakes to give even unnecessary instructions in this class of cases, the instructions should not be framed, so as even by remote construction to limit the free action of the jury in considering the testimony before them.

It is next said that the court erred in giving the fourth instruction, which was as follows: " That to render the homicide justifiable by the law, on the ground of self-defense, it must appear from the evidence that Cotton, the accused, acted con-

he would be bound to find him guilty,—in a case, where, on the preliminary examination he denied having formed or expressed an opinion. Cody v. State, 3 How., 27. That a juror has impressions as to the guilt of the prisoner, derived from hearing the testimony in another case, is not sufficient to disqualify him. " To disqualify," it was observed, " the juror must have formed and expressed an opinion, or have such acknowledged prejudice or bias as would disable him from doing justice, according to the evidence between the state and the accused." Noe v. State, 5 How., 330. Though no general rules of competency can be fixed, each case depending on its peculiar circumstances, it may be stated generally, that a juror is incompetent to sit in a case on which his mind is so far prejudiced as to require evidence to annul the opinion he has formed. Sam v. State, 13 S. & M., 189. Even though the opinion is formed from rumor, it disqualifies, if evidence is required to remove it. Alfred v. State, 37 Miss., 296; Ogle v. State, 33 Miss., 383.

scientiously upon reasonable fear, founded upon present overt acts of Smith, the deceased, to all appearances hostile, threatening a felony or some great personal injury ; and the danger of such felony being accomplished or great personal injury being inflicted, to all appearances must be immediate, pending, and unavoidable at the time of killing, though there really might be no actual danger."

The party interposing the plea of self-defense, on a trial for murder, must be understood as undertaking to show that in the perpetration of the deed he acted under a necessity, either actual or apparent, forced upon him by the party killed; for if such were not the case, his defense cannot avail him any thing, or certainly not further than to mitigate the crime. The very defense presupposes danger to the party's life or person, except in cases where he may act in defense of the life or person of another. When he assumes the defense, he at the same time undertakes to establish the danger, or what is the same thing, what appeared to be danger. The question presented by this instruction is, in what manner must the danger exist to justify the party in taking the life of his adversary ? The law says that there must be reasonable ground to apprehend a design to commit a felony, or do some great personal injury, and imminent danger of such design being accomplished. Hutch. Code, 957. Reasonable ground to apprehend the design and imminent danger of its accomplishment must both exist at the same time. What is reasonable ground to apprehend such design must always be as much, or, indeed, more a question of fact for the jury than a question of law for the court; for, while it is true that, in regard to inanimate subjects, where the fact is the same, the law must also be the same, this is not true, even as a general rule, in this class of cases. The hostile demonstrations of two men may in every respect be the same ; yet the party threatened may be placed in imminent peril from the conduct of one and feel not the slightest danger from the other. A design to commit a felony or to do some great personal injury may be apprehended in the one case and it may have no existence whatever in the other. One may excite fear and the greatest apprehensions of danger, while the same demonstra-

tions on the part of another may only excite mirth and ridicule. The question is in both cases the same — was there imminent danger to the life or to the person of the party threatened? As a part of the means of arriving at the truth of this fact, the peculiar character of the hostile party is as much a fact for the consideration of the jury as any other fact in issue; and the jury must determine from the hostile demonstrations whether there was such danger of *this party's* executing his felonious design as to justify the party killing; in doing so, although there may have been no actual danger from the deceased at that very moment of time, the question in such case is, whether, by the delay, the danger is not increased; as, for instance, suppose the party threatened is in the upper story of a building, and the ground to apprehend the design to take his life or do great personal injury, is there for the first time discovered, and his adversary leaves for the purpose of arming himself and taking a favorable position at the foot of the stairs, with the known and avowed purpose of committing the deed while the party is descending to make his way out of the building, would a few moments, or even ten minutes, make any difference in the killing in such a case? The very act of allowing the hostile party to escape might prove fatal to the party threatened and deprive him of all means of self-defense. It may be said that this is putting an extreme case. Grant it. It nevertheless serves the purpose for which it was intended, of showing the impropriety of laying down a rule, within the operation of which the court declares a person, without regard to the peculiar circumstances of the case, must bring his defense, in order to be successful. Whether the danger must be immediate or unavoidable at the time of killing to justify the party in the act, must depend upon the facts and circumstances of the case. This is the only general rule which a court can with any safety lay down on the subject. The jury must of necessity be the judges whether reasonable ground to apprehend the design contemplated by the law existed, and whether there was imminent danger, from all appearances, that such design would be executed. In arriving at their conclusion on this subject, they are expected to avail themselves of such knowledge as they

possess in regard to human transactions from their intercourse with society. The right of self-defense is not derived from the law. All the law attempts to do on the subject is, to prescribe rules of caution and prudence to be observed by persons before exercising the right, by ascertaining whether the danger exists and whether it is imminent; and, as already remarked, whether it must be immediate and impending at the very time of killing, will depend upon the facts and circumstances surrounding the transaction.

But it is not necessary to pursue this subject further, and we proceed next to notice the seventh instruction, as follows: " That if the accused was armed with a deadly weapon, and sought and brought about the difficulty with the deceased, and killed the deceased, in the difficulty, with such weapon, he is guilty of murder." The fact of a man being armed with a deadly weapon, though he may be the aggressor in a difficulty, amounts to nothing, unless he provided himself with the weapon, with a view to using it if necessary in overcoming his adversary. It may be a man's habit, as it is unquestionably his right under the law of this state, to carry a deadly weapon, and whether he is permitted to use it or not, must depend upon the nature of the difficulty in which he may be involved. A man may begin a difficulty, intending to inflict no violence, or next thing to none, on his antagonist, and may be so closely pressed as to be forced to use his weapon in self-defense. The rule is stated thus by Blackstone: " If the slayer has not begun the fight, or (having begun) endeavors to decline any further struggle, and afterwards being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide, excusable by self-defense." 4 Bl. Com., 184. In such case, the party having commenced the difficulty, he can only use his weapon in self-defense, or take the life of the other party, when the danger is immediate or impending, and unavoidable.

The first and second instructions, asked on behalf of the prisoner, simply announce, as a legal proposition, that to make out the crime of murder, it must appear that the prisoner " acted from a premeditated design, formed beforehand, to effect the death of the deceased." These instructions ought to have been

given as asked, as they were entirely free from objection. The court may modify an instruction to make it correct, but if it be already correct, it ought to be given as asked by counsel.

The qualification of the court, made to the third instruction, is clearly erroneous. The instruction is, in substance, that if Cotton killed Smith, not in pursuance of a premeditated design, but on a sudden quarrel, the crime of murder is not made out. The modification made is, " unless Cotton sought the quarrel and used a deadly weapon." The question was, whether malice prompted the accused to kill. He interposed, as his defense, by the instruction, " *no design to kill,* and that the killing was on a sudden quarrel." The court say to him that this is no defense, not even to mitigate the crime, if you sought the quarrel and used a deadly weapon. Now, he may have done both, without being guilty of murder; for he may not, by seeking the quarrel, have intended the slightest personal injury to the deceased, and he may, from sudden provocation, have used his weapon, or he may have been forced to do so in self-defense, although he was the aggressor in the quarrel.

The modification amounts to this, that although there must be a formed design to take life, to constitute murder; yet such design is not necessary where the party killing seeks the quarrel, and uses a deadly weapon.

There must be proof of malice, in some form; the seeking of the quarrel, and using the deadly weapon, may be evidence for this purpose. But this is what the defendant below was endeavoring to meet, by showing no design to take life, because the killing occurred on a sudden quarrel. The modification virtually declares this to be no defense, if the party sought the quarrel.

We will briefly dispose of the error last assigned—the motion in arrest of judgment.

The *venire* from which the grand jurors were taken, contains their names in full; but their Christian names, that is of some of them, are abbreviated on the minutes of the court; as, for instance, the name of Fountain Barksdale appears in full on the *venire,* and it is F. Barksdale on the minutes. We do not think this error can prevail, when the record shows that the grand

jurors were taken from the persons whose names appear on the *venire.*

It is next said that one of the grand jurors was excused, and the record does not show upon what ground. The record shows that the excuse was, by the court, considered sufficient. This must be treated as a legal excuse.

Judgment reversed, *venire de novo* awarded, and cause remanded.