## Mask *v.* State, 36 Miss. R., 77.

### Homicide.

In questions respecting the character of witnesses, the doctrine respecting *ante litem* and *post litem motam* is in no way applicable. The jury were instructed that "If the act producing death be such as is ordinarily attended with dangerous consequences, as by the use of a deadly weapon, or be committed deliberately, the malice will be presumed, unless some sufficient excuse or provocation be shown; for the inference is that the natural or palpable effects of any acts deliberately done were intended by the agent." *Held* to have been properly given.

Though one of several instructions, taken by itself, may have been erroneous, yet, if taken in connection with all the others, the law be, on the whole, correctly expounded, the judgment will not be reversed.

The circuit judges have a right, in proper cases, to modify instructions asked.

Error to Marshall county circuit court. SCRUGGS, J.

The plaintiff was convicted a second time, in the court below, of the murder of Susan Elizabeth Smith, the first verdict having been set aside by this court. See 32 Miss. R., 405.

The following is the substance of the evidence:

For the State.—William Smith is a brother of the deceased, who was about sixteen years of age at the time she was killed. On the 26th of April, 1856, between three and four o'clock in the evening, the prisoner, James Mask, his brother, and Thomas and Henry Wooley, his brothers-in-law, came to witness' father's house, and stopped at the gate in front; deceased, who, with her sister Sarah Jane, had just started to the spring for water, informed witness that there were some men at the gate, who wanted to see him; witness went out and saw the above-named parties there; witness spoke to them, and asked them to get down; the two Masks were near the gate on their mules, and the two Wooleys were a " little piece off;" they asked for witness' father, and witness sent his little brother, who was with him, to tell his father to come out; witness' sisters passed out of the gate to the spring, and the prisoner reined his mule out of the way to let them pass, and said " Good evening " to them; witness' father then came out, and James Mask said he wanted to speak to him; witness' father and Mask went aside, about fifteen paces, witness' father on the inside, and Mask on the outside of the fence; the prisoner asked witness to come outside of the gate, saying he wanted to speak to him; witness replied he could talk as well where he was; the prisoner then got down from his mule, and threw the bridle-reins over the gate-post, and said: " I understand you said, or swore, you saw me take corn out of that crib;" witness replied that " he did;" prisoner immediately presented a pistol at witness, and fired, shooting witness in the left jaw; witness turned his right side to the prisoner, who fired again, striking him in the right arm; the prisoner fired a third time at witness, but missed him; wit-

ness' sister Sarah was then about twenty yards from the gate; the deceased was nearer; deceased said to prisoner: "You had better get away from here;" prisoner then immediately wheeled and shot her; witness saw deceased and prisoner at the time; she was about eight yards from the gate, and had a bucket on her arm; "prisoner seemed in the act of alighting, as though he had sprung towards her;" "he threw his pistol over, touching the tail of her bonnet, and fired; the ball struck her about half way between the left nipple and point of her shoulder, and she died in a few minutes;" witness did not see the Wooleys do anything, and as soon as prisoner shot deceased, he ran off; witness had no pistol or other weapon about him at the time of the shooting, but immediately afterwards he went into the house and got a gun, and came out with it, and met Ricketts and others bringing the deceased to the house; witness did not shoot, or use the gun in any way.

The wounds made on witness were small, and made by turkey-shot; he was about a yard and a half from prisoner when he shot him; witness' face was powder-burnt; witness saw his sister after she was killed; did not notice the size of the wound, but noticed that her dress was powder-smoked.

R. J. Smith is the father of the deceased; the witness corroborates Wm. Smith until the point where he went aside with James Mask, except that he did not hear what had passed between Wm. Smith and the other parties before witness came out of the house. He further stated that after he and James Mask had gone aside, the latter asked him "if he had ever said he saw Pleasant Mask stealing corn?" and pointing back to him, said, "that was a brother of his;" witness replied that he had not said so, and told him what he had stated before the magistrate; witness heard the firing on his son, and left James Mask and went towards his son; witness heard deceased tell prisoner "he had better be leaving there;" he immediately wheeled round and shot her; he either run or jumped to her; the tail of deceased's bonnet was long, and hung low down on her person, and prisoner's pistol caught in it as it fired; as prisoner approached her, he pushed the pistol towards her, and he thinks the muzzle touched her bonnet; witness' two daughters were

screaming at the time the shooting was going on; witness saw none of the other parties (J. Mask and the Wooleys) do anything; William did not get the gun until after deceased was shot; witness does not know whether deceased's clothing was burnt or not.

Sarah Jane Smith is a sister of deceased; she saw the four men (Masks and Wooleys) ride up to the gate; they asked witness and deceased, who were in the yard, having started to the spring, " if their brother was at home?" they told them he was; they then said, " Tell him to come out;" deceased went back and told her brother; deceased and witness went out of the gate on their way to the spring; soon heard firing; prisoner shot her brother first; he fired three times, and then shot her sister; witness was twenty-five or thirty yards from the gate when the firing commenced; prisoner, after shooting her brother, turned round and jumped two or three steps towards deceased; he put the pistol close to her—seemed to be right at her, and fired; he then ran off down the hill towards the spring, close by witness; witness saw the pistol when deceased was shot, and thought it was nearly touching deceased; she did not see the pistol catch in deceased's bonnet; she did not hear deceased say anything to prisoner before he shot; prisoner stopped a short time when he shot deceased; he then came on by witness, running down the hill, with the pistol in his hand; the several firings of the pistol were in very quick succession.

All of the foregoing witnesses concur in the statement that the Wooleys did not leave until after deceased was shot, and that they were in a position to see the shooting.

Reuben Ricketts stated that he did not come out of the house until the firing was over; when he came out, he saw three of the parties running off, one on foot, and the other two on mules; witness went down where deceased was, and as he went back to the house with deceased, he met William Smith with a gun; deceased said she was shot, and must die; she died in a few minutes afterwards; the firing was in quick succession; did not observe any difference in time between the reports.

H. D. Wilson was one of the company who arrested prisoner

in Tippah county, in May, after deceased was killed; witness was not among the first who went to the house where prisoner was, but came up after the prisoner had been arrested and brought out; William Spillers, William J. Smith, and Mr. Julian were along in company; when witness went up to where prisoner was, he asked prisoner to give up his arms, if he had any; told him if he resisted he would shoot him; prisoner said he had no arms, and gave up an old broken-back spring-knife that he had; afterwards prisoner was sitting on the ground, and the company was standing round, and witness squatted down by prisoner, and asked him if he killed the woman; prisoner said "he did, but was very sorry for it;" witness then asked prisoner if he shot William Smith; prisoner said, "Yes; and, damn him, if it was to do over again, he would do it again."

Cross-examined.—Witness first mentioned the conversation to Mr. Julian, the next day, on their way to Holly Springs; witness never said this conversation took place at De Shong's store; witness was summoned on the former trial, but was not examined then; he did not communicate this conversation to any one of them.

William J. Smith.—Witness is not related to the deceased; he had a conversation with prisoner after his arrest, and when they were bringing him to the jail; if any of the rest of the company was near, it was William Spillers, and witness don't recollect that Spillers was present; witness asked prisoner if he killed Miss Smith; he replied that "he did, and did not know why he did it;" witness then asked him if he shot William Smith; and he said, "Yes; and that he did it because he swore against him in court; and that he went there with the intention to kill William Smith, and would do so again, if it was to do over again."

On Saturday before the killing, witness, prisoner, and old man Wooley were together, and prisoner said, "If any man came in court and swore he stole corn from Mr. Norris, he would put the contents of that into him," at the same time pulling out a revolver.

Cross-examined.—Don't know to whom he first mentioned the above confession of prisoner; thinks he did not mention it

until after the trial at court; he did not want to be a witness against the prisoner.

For the defendant.—Julian.—Was one of the men who went to arrest prisoner; the question was asked him, why he killed the woman; he said "he did it accidentally;" witness told him "not to say that any more, as any one in broad daylight could have known it was a woman;" prisoner hushed, and said no more; witness don't know who asked the question, or whether witness Wilson was present or not; witness was not one of the first who came up after prisoner was arrested; Wilson came up after witness did; witness was present all the time after Wilson came up; when Wilson came to where the prisoner was, the latter had his knife in his hand, "whittling;" Wilson said to him, "Don't draw your knife on me, or I will shoot you;" the conversation with prisoner, as related by witness, occurred before this circumstance; witness don't recollect of hearing prisoner tell Wilson anything about killing the woman, nor to have noticed Wilson squat down by him; last year (the trial took place in October, 1857) Wilson told witness something about what prisoner said to him; witness can't recollect exactly how Wilson told it, but thinks he said "prisoner told him he killed the woman, but did not go to do it; thought she was a man rushing on him;" but witness can't say certainly that was the way Wilson told it.

Cross-examined.—Witness knows Wilson, and believes him to be a man of truth, and would believe him on oath.

Thomas Wooley.—Witness, prisoner, Henry Wooley, and James Mask rode up to Smith's, and halloed; William Smith came out; told him he "wanted nothing to do with him, wanted to see the old man;" the old man came out, and James Mask rode up to the house some twenty steps, to talk with him; William Smith came up to the gate, and said to the prisoner, "What have you come here for, you d—d thief?" prisoner replied, "Don't call me a thief, or I'll shoot you; and that he did not come here to be called a thief, and would not allow it;" William Smith called him a thief again; he also drew his knife, and said he would stab prisoner; prisoner then shot him; he shot three times, and then immediately wheeled round and went off

down the hill; he made no stops at all; James Mask had a pistol and a stick with him; prisoner had a pistol, which witness saw loaded that morning with turkey-shot, one in each barrel; Henry Wooley had a rifle-gun.

*Cross-examined.*—Witness is a brother of prisoner's wife; saw the pistol loaded at prisoner's house; don't know why it was loaded; did not hear prisoner say why he loaded it; witness went to prisoner's house the night before, to show James Mask the way there, as he had just come into the neighborhood; witness, prisoner, and James Mask went that morning to prisoner's father's; they had no conversation or understanding about the Smiths; they met with Henry Wooley at his father's; witness was not with prisoner all that day; prisoner went to a store, and stayed there awhile, and then came back to witness' father's, and after dinner started to Smith's, to make a compromise about the matter between them; James Mask halloed when they got to Smith's, and William Smith came out; witness did not see the girls then; William Smith called his father out; witness did not see a little boy go after him; witness saw the girls pass out of the gate; defendant was some ten or twelve steps from the gate, and got out of their way, and spoke to them; witness did not hear prisoner ask William Smith to come outside, that he wanted to talk to him; prisoner got off his mule when William Smith called him a thief, and said he would shoot him if he called him so again; William Smith then drew his knife; it was a large one, with a long blade and keen point; witness did not see prisoner shoot deceased; he heard no other reports but the three shots fired at William; witness was on his mule, a short distance off, and looking back; don't know who shot deceased.

Mrs. Catherine Terrill.—Saw deceased after her death; saw her clothes, " but not good;" saw her bonnet, and thinks the one in the court is the same; saw no sign of burn about it, and sees none now; saw the wound on Miss Smith, and thinks it was some larger than the one on William Smith.

R. L. Walker.—Saw deceased next morning after she was shot; saw the wound, but did not examine it minutely, and thinks it was as large as would have been made by a rifle-ball of.

the size of 80 to 100 to a pound; don't think a turkey-shot could have made it; saw no powder-burns about deceased's clothing that he recollected.

Cross-examined. — Knows Thomas Wooley; has heard his character for truth and veracity spoken of; the general opinion is unfavorable to it; it would depend on circumstances whether witness would believe him on oath; never heard Wooley's character spoken of until after the shooting of Miss Smith.

The testimony of witness, on cross-examination, was objected to, for the reasons stated in the opinion of the court.

Miss E. Wooley.—Witness is a sister of prisoner's wife; was at prisoner's house on the morning of the killing; saw him load his pistol; it was a revolver, had six barrels, and each was loaded with one shot; she went with the "parties" to her father's; they stayed there until after dinner, when they left; the Masks said " they were going up to see about things, and would be back that night;" Pleasant and James Mask, and her brothers, started to Pleasant Mask's, to secure the house; they came back and stayed that night; Pleasant and James started for home next morning, but came back before reaching home, and left; her brother Henry left the country; he did not go with the Masks; had a rifle when he went away; it was loaded; he has not been back since.

Cross-examined.—Heard them say nothing about going to Smith's, and heard them threaten no one; paper was put on the shot in the pistol.

Dr. Robinson examined William Smith's wounds, and proves that they were small, and made by turkey-shot; and that his face was somewhat powder-burnt; did not see deceased; thinks pistol held within six inches would make a larger hole than if held six feet off.

Aaron Woodruff stated, if the muzzle of the pistol was entangled in the bonnet when it was fired, it would have burnt the bonnet some, and left some mark; " does not think that shot of size shown (turkey-shot) could make a hole as large as the one shown in dress of deceased;" a pistol fired will throw powder further in the face than it would burn clothing; pistol fired near dress of the kind shown witness (dress of deceased) would be apt

to carry the dress into the wound, and make it somewhat larger. The bonnet of deceased was shown witness, being a light, thin cotton one, and witness thought that a pistol fired while touching it would be almost certain to burn it; and

John Trousdale, another witness, was of the same opinion.

Several witnesses were then called for the state, who agreed that Thomas Wooley's character for veracity was bad, and stated that they would not believe him on oath; one of these, Blackard, stated, however, that he had never heard his character questioned until after the killing of Miss Smith. This testimony was objected to for reasons stated in the opinion of the court.

This was all the evidence.

The court, at the instance of the district attorney, instructed the jury as follows:

1. If the jury believe, from the evidence, that the defendant went to the house of R. J. Smith with intent to kill, or to commit some felony upon him or William Smith, or both, and that whilst there engaged in carrying out such intention, defendant shot and killed Susan Elizabeth Smith, the jury will find him guilty of murder.

2. Murder is the unlawful killing of a human being, in the peace of the state, with malice aforethought, or premeditated design, which is the same thing. Malice is either express or implied in law; express malice is where one person kills another with a sedate, deliberate mind, and formed design; such formed design being evidenced by external circumstances discovering the inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some bodily harm. And malice is implied by law from any deliberate, cruel act, committed by one person against another, however sudden.

3. If the act producing death be such as is ordinarily attended with dangerous consequences, as by the use of a deadly weapon, or be committed deliberately, the malice will be presumed unless some sufficient cause or provocation should be shown; for the law infers that the natural or probable effects of any act deliberately done were intended by the agent.

4. If the jury believe, from the evidence, that defendant shot

deceased with a deadly weapon and killed her, the law infers malice in the absence of proof showing the contrary; and unless the evidence shows something to excuse or mitigate the act, the jury will find him guilty of murder.

5. Every man is to be taken to intend that which he does, or which is the immediate or necessary consequence of his act. A mortal wound, given with a deadly weapon in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* wilful and premeditated killing, and in the absence of further excuse or explanation, is murder.

6. No affront by base words or gestures, however false or malicious, and aggravated with the most provoking circumstances, will free the party from the guilt of murder. If, therefore, the jury believe from the evidence that the defendant, for mere affront by words uttered at the time of killing, or at any other time of killing, or at any time, by deceased, or by any other person, unlawfully killed deceased with a deadly weapon, they will find him guilty of murder.

7. If the jury believe, from the testimony, that the defendant was endeavoring to kill William Smith, or commit a felony upon him, and killed in that attempt the deceased, either accidentally or wilfully, they will find him guilty of murder.

The following instructions were given, as asked by the prisoner:

1. If the jury have any reasonable doubt, from the testimony, that the prisoner is guilty of murder, they may acquit him of murder and find him guilty of manslaughter.

3. In all criminal cases whatever, it is essential to a verdict of condemnation that the guilt of the accused should be fully proved; neither a mere preponderance of evidence, nor any weight of preponderant evidence, is sufficient for this purpose, unless it generates the full belief of the fact, to the exclusion of every reasonable doubt.

4. In a charge of murder, the guilt to be established is not the killing only, but also the killing with premeditated design to effect the death of any human being; and the evidence must generate the full belief of the fact, to the exclusion of every rea-

sonable doubt, or the jury cannot find the defendant guilty of murder.

5. If the jury believe the defendant killed the deceased without a design to effect death, in a heat of passion, but in a cruel and unusual manner, such killing will not be murder, but manslaughter.

6. The law presumes malice from the use of a deadly weapon, but this presumption may be rebutted by proof from the circumstances under which the weapon is used.

7. The law presumes every man innocent until his guilt is established; and it devolves upon the state, in the present case, to prove the defendant guilty of murder, to the exclusion of all reasonable doubt from the minds of the jury, or they must acquit.

8. If the jury believe, from the evidence, that the defendant took the life of Susan Elizabeth Smith, but the act was committed in a sudden transport of passion, and without malice, then the said defendant cannot be convicted of murder, but only of manslaughter.

11. If the jury believe, from the testimony, that the confessions were made from fear, threats, or hope of benefit, such confessions do not warrant a verdict of guilty.

13. The killing a human being without a design to effect death, in a heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, is manslaughter only, and not murder.

14. If the jury believe, from the evidence, that the deceased was shot by some other person than the defendant, he cannot be held responsible for the act, unless they further believe from the testimony that such killing was effected by some one jointly engaged with the defendant in the commission of a felony, and that such killing was done strictly in prosecution of the purpose for which the party was assembled.

The court refused to give the following instructions as asked by the prisoner, but gave them with the subjoined modifications, made by the judge.

" 2. If the jury from the whole body of the evidence are con-

vinced of the killing by defendant, but are not convinced beyond reasonable doubt that it was done with malice, they cannot find the defendant guilty of murder, but may find him guilty of manslaughter."

The judge modified this as follows : " By killing with malice is meant not through hatred or revenge, but a killing with intent to kill, and without lawful excuse ; and such malice is presumed when the killing is done with a deadly weapon, and without lawful excuse."

" 9. If the jury believe from the evidence that the defendant went to the premises of R. J. Smith with the intention of committing a felony, and after this intention was consummated he accidentally shot and killed the deceased, they cannot find him guilty as charged."

The judge modified the 9th charge as follows : " Unless the accidental killing happened so nearly in connection with the execution of the original design, as to constitute one continuous transaction ; in that event it would be unlawful killing, in the perpetration of felony, and would be murder."

" 10. It is essential to the conviction of the accused that all the facts of the case, and all the testimony introduced, should be entirely consistent with the hypothesis of his guilt, and all the circumstances should be of a conclusive nature and tendency ; and unless the jury believe from the testimony that the circumstances tend to show beyond a reasonable doubt that the defendant killed the deceased, and that the killing was with a premeditated design to effect death, they cannot find the defendant guilty of murder."

Which was modified as follows : " That is, the body of the proof must be of conclusive character, and must lead to the conclusion of his guilt to the exclusion of all reasonable doubt."

" 12. If the jury believe from the evidence that the defendant had gone to the house of the prosecutor with the intention of committing a felony on William Smith, and after such intention had ceased, and while defendant was fleeing, he shot and killed deceased, upon sudden heat of passion, and without the premeditated design to effect death, he is guilty of manslaughter only, and not of murder."

Which was modified as follows: "Unless, as already stated in explanation of defendant's 9th charge, the killing took place so nearly in connection with the commission of the felony upon the person of William Smith, as to constitute one continuous transaction; in that event the killing would be properly considered as having happened in the attempt to perpetrate a felony, and would be murder."

"15. Confessions of the accused in capital cases are the weakest species of evidence, and must all be taken together, as well those which make in favor of the prisoner as those which make against him."

Modification by the court: "The confessions of the defendant are to be taken altogether, it is true, but the jury are not bound to credit them all, but may treat them as other evidence, crediting all or none, or crediting a part and disobeying a part, as in their judgment is right and according to the truth."

The jury found the defendant guilty of murder.

He moved for a new trial: 1. Because the verdict is contrary to law and the evidence. 2. The court gave improper instructions for the state. 3. The court refused proper instructions asked by defendants, and made improper modifications of them. 4. The court refused to continue the case. And, 5. The court suffered improper evidence to go to the jury.

This motion was overruled, and sentence of death pronounced; and the defendant sued out this writ of error.

*H. W. Walter* and *J. W. Clapp*, for plaintiff in error,

Cited, 1 Russ. on Cr., 423; McDaniel v. State, 8 S. & M., 401; Cotton v. State, 31 Miss. R., 401; 1 Stark. Ev., 182, 183.

*T. J. Wharton*, attorney general,

Cited, Philips v. Kingsfield, 19 Maine R., 375; 2 Russ. on Cr., 539 and 869; 4 Black. Com., 200; 4 Mass R., 396; State v. Zellers, 2 Halstead R., 220; 2 Stark. Ev., 524; 4 S. & M., 118; Bolls' case, 9 ib., 284; Cicely's case, 13 ib., 210; Green's case, 28 ib., 688; Jolly's case, 13 S. & M.; McCann's case, ib. 497; Wharton's Crim. Law, 2d edit., 378.

HARRIS, J.:

The plaintiff in error was convicted upon an indictment for murder in the circuit court of Marshall county. This writ of error is prosecuted to reverse the judgment pronounced on that conviction. Six causes of error are assigned. We shall, however, notice those only which are relied on in the briefs of counsel and in the argument of the case, the others having been waived, by agreement, as not being sustainable.

The first ground of error relied on is, that the court erred in permitting Walker and Blackard to answer the questions in relation to the character of Thomas Wooley for truth and veracity, and permitting said answers to go to the jury as evidence.

It is contended that these witnesses never heard the character of Wooley for truth and veracity called into question until after the killing; their testimony to impeach his character should have been rejected, on the principle *post litem motam*, applicable to *hearsay* evidence, even when otherwise admissible.

This is certainly a novel application of the rule, as well as a misconception of the reasons on which it was founded.

The doctrine of *ante litem motam*, or that evidence of reputation or common fame, must be confined to declarations "*made before any controversy arose*," is a qualification of *this* exception to the general rule of excluding hearsay evidence, to wit: that in matters of public and general interest, evidence of common reputation is admissible. The ground on which such evidence is admitted is, that the declarations offered are the natural effusions of one who knows the truth, and speaks under circumstances wholly devoid of temptation to falsify it. 1 Greenleaf Ev., chap. 6, §§ 127, 131; Whitlock v. Baker, 13 Ves., 514; Rex v. Cotton, 3 Campbell, 444-446.

Formerly the rule was limited to declarations made before the *commencement of the suit*. The latter and better doctrine is, that to avoid the mischiefs which might otherwise result, all *ex parte* declarations, even though made upon oath, referring to the beginning of the *controversy*, are to be rejected.

The *lis mota* here referred to has relation to the *principle subject in controversy*, before the commencement of the suit, and *in issue on the trial*, where the evidence is sought to be intro-

duced, and not to *collateral* and *incidental questions*, arising in the progress of the trial, for the first time, as a matter of controversy.

To prove that a witness is a man of bad character among his neighbors *generally*, that by *common reputation* he is devoid of truth, does not prove that there ever had been a *controversy* or dispute on that subject, but rather the contrary; that it was a subject of public and general agreement among his neighbors about which there was no controversy; and the force of such testimony to discredit a witness must always depend on the extent of this general agreement. These facts are always elicited, or not, at the discretion of the counsel, before the jury; and in proportion as the matter of character is settled or controverted in his neighborhood, will the jury attach importance to the opinion of the witness called to discredit him.

In the sense of our law, therefore, says Mr. Greenleaf, "The *lis mota* carries with it the further idea of a *controversy upon the same particular subject in issue.* For, if the matter under discussion at the trial, was not in controversy at the time to which the declarations offered in evidence relate, they are admissible, notwithstanding a controversy did then exist upon some other branch of the same general subject."

Where the point in controversy is foreign to that which was before controverted, there never has been a *lis mota*, and consequently the objection does not apply. See 1 Greenleaf's Ev., § 132.

We conclude, therefore, that there is no error in this assignment. It is next insisted, on the part of counsel for plaintiff in error, that the court erred in giving the third charge asked on the part of the state, as follows:

"If the act producing death be such as is ordinarily attended with dangerous consequences, as by the use of a deadly weapon, or be committed deliberately, the malice will be presumed, unless some sufficient excuse or provocation should be shown. For the law infers that the probable effects of any act deliberately done, were intended by the agent."

It is objected to this charge, that it does not contain the qualification that the malice may be rebutted as well by the

evidence as produced against the defendant, as by his own testimony, and the case of McDaniel against the State, in 8 S. & M., is cited as an authority in point. The charge held erroneous in that case was this: "Every homicide is presumed to be committed with malice aforethought, and it devolves on *the prisoner* to prove the circumstances which excuse the act." The court held that the jury should not have been limited in their investigation to the evidence produced by the prisoner alone, but they should have been instructed to look to the whole evidence, both that against him as well as for him, for circumstances of justification or of excuse for the act. In the case before us no such limitation occurs, but the instruction strictly conforms to the ruling of the case cited from the court.

The third cause of error insisted on, is the giving the seventh instruction asked by the state, to the following effect: "If the jury believe from the testimony that the defendant was endeavoring to kill William Smith or commit a felony upon him, and killed, in that attempt, the deceased, either accidentally or wilfully, they will find him guilty of murder." And it is upon this assignment that counsel mainly rely in their argument for a reversal of the cause. It is urged with much zeal and ingenuity that the charge, as asked and given, precluded the jury from all inquiry into the circumstances of alleviation, justification, or excuse, that may have existed, and induced the attempt to kill William Smith, and the accidental killing of deceased, and required them to return a verdict of guilty of murder, notwithstanding they may have been satisfied from the evidence, that in such attempt the defendant was acting in self-defense.

To this view of the instruction objected to, several answers occur to us, either of which is deemed conclusive on this assignment.

First. "It is the settled rule of this court, that all the instructions given by the circuit court on the trial of a cause, must be construed together; and if, when all taken together, the law be correctly given, the judgment will not be reversed because a single instruction, taken by itself, might be too broad in its terms." Childress v. Ford, 10 S. & M., 25.

Taking this rule as a guide, and placing the seventh instruction for the state and the fourth instruction for the defendant together, to explain and make it more intelligible, as it was doubtless intended, let us see whether it was possible for the jury to have misunderstood its meaning.

Seventh. " If the jury believe, from the testimony, that the defendant was endeavoring to kill William Smith or commit a felony upon him, and killed in that attempt the deceased, either accidentally or wilfully, they will find him guilty of murder."

Fourth. " In a charge of murder, the guilt to be established is not the killing only, but also the killing with premeditated design to effect the death of any human being, and the evidence must generate the full belief of the fact, to the exclusion of all reasonable doubt, or the jury cannot find the defendant guilty of murder."

Add to this the fifth instruction for defendant : " 5. If the jury believe from the evidence that the defendant killed the deceased without a design to effect death, in a heat of passion, but in a cruel and unusual manner, such killing would not be murder, but manslaughter." And the thirteenth instruction for defendant, as follows : " 13th. The killing of a human being in the heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, is manslaughter only, and not murder." Taking these instructions altogether, this assignment is wholly untenable.

The fourth instruction informed the jury that, to constitute murder there must have been premeditated design to effect the death of some human being.

The fifth instruction informed them, that if the killing was without design to effect death, but in the heat of passion, and in a cruel and unusual manner, that such killing would only be manslaughter.

And the thirteenth instruction informed them, that under the last-named state of facts, the defendant would not be guilty of manslaughter even, if such killing was committed under circumstances constituting excusable or justifiable homicide.

These, with other instructions in the record, left the jury untrameled to consider the defendant's case, and to decide it according to the facts and circumstances in proof before them.

Again, the precise point here presented has been determined by this court in Cotton v. State, 31 Miss. R., 504. In this case the following instruction was asked and given for the state: "If the jury believe, from the evidence, that the accused killed the deceased, and no accompanying circumstances appear in the evidence to *excuse* the act, the law presumes the killing was done maliciously, and they will find him guilty of murder."

The same argument was made for reversal upon this instruction as now presented to us, to wit: That the instruction limited the investigation of the jury to the crime of murder, or to the defense of excusable homicide, and that they were not permitted to take into consideration the defense of manslaughter.

The court, in answer to this objection and argument, says: "Our conclusion upon the point is, that the instruction was wholly unnecessary; that it did not in the least influence the jury, and we should not, therefore, reverse the judgment on this ground."

But again: The cases are numerous, not only in this court, but elsewhere, extending both to civil and criminal cases, that "where the judgment of the court below is *clearly* right, the High Court of Errors and Appeals will not be warranted in reversing it because the instructions asked were erroneously given or refused." McLanahan v. Barrow, 27 Miss. R., 664; State v. Cotton, 31 Miss. R., 504; Brantley v. Carter, 26 Miss. R., 282; Cantzon v. Dorr, 27 Miss. R., 245; Hill v. Calvin, 4 How. R., 231; Baynton v. Furnall, 4 S. & M., 193; Wilkinson v. Griswold, 12 S. & M. 669; Wiggins v. McGimpsey, 13 S. & M., 532.

Wharton says: "If an error be immaterial and irrelevant, and justice has been done, the court will not set aside the verdict, nor enter into a discussion of the question of law." American Criminal Law, § 3080, 4th revised edition, citing very many authorities, ancient and modern, English and American, for the rule.

Considered in reference to this reasonable rule, the assignment of error under consideration seems to be wholly without

force. There is not only no testimony to support the defense attempted to be insinuated, that the deceased was killed by the defendant accidentally, while attempting to kill her brother, but the proof is overwhelming, both from his own confession and other testimony, that the suggestion is utterly untrue.

The testimony shows that the killing was not accidental, but intentional; that instead of its being connected with the act of shooting at William Smith, or endeavoring to kill him, it was after defendant had left him, and was going from him, that he met and killed deceased.

The instruction was, therefore, unsupported by any evidence whatever; and taken alone, even if it were so erroneous, in the language of the court in the case of The State v. Cotton, "did not in the least influence the jury, and we should not, therefore, reverse the judgment in error."

The next error insisted on in argument is, that it erred in modifying several instructions asked by the defendant, which, without such modifications, stated the law correctly, and this argument is more directed to the general impolicy of such a practice than to any erroneous charge made by the modifications complained of. Indeed, on examination of these several charges, with their respective modifications, as given by the court, we are satisfied that they stated the law correctly. In Boles v. The State, this court has said that, "in criminal trials, the circuit judge is not bound to give or refuse the instructions asked by counsel on either side in the precise terms in which they were framed. He may modify the charges asked on both sides, so as to make them conformable to his own views of the law." 9 S. & M., 284; Green v. The State, 28 Miss. R., p. 687.

It is, therefore, not only the right but the duty of the presiding judge to modify all instructions, "so as to make them conformable to his own views of the law." In the exercise of this right, this court is to presume that the high and dignified tribunals to whose discretion it is previously committed, are always actuated by motives consistent with the delicate, responsible, and important trusts confided to their care. While, therefore, we admit the soundness and force of the views of counsel of the impolicy, as a general rule, of the unnecessary interfer-

ence of the court in modifying instructions for the defendant, drawn with legal accuracy and precision, both as to the terms employed and the principles declared, yet this is matter of discretion and taste for their determination, and not ours, so long as they properly declare the law given in charge.

In this case we think the law was properly expounded by the court below, when considered altogether, according to the established rules referred to, and in reference to the testimony in the cause. And we feel satisfied that the jury could not have been in any manner misled, to the prejudice of the defendant, by any instruction or modification, exhibited in the record as having been submitted to the consideration of the jury.

The last ground of error insisted on is that the verdict of the jury was contrary to the evidence, and the court should have granted a new trial.

But for the able, earnest, and ingenious review of the testimony in the cause, by the respected counsel who seemed seriously to entertain this view, we should have regarded this last assignment as *pro forma* only. Impressed, however, with the zeal, as well as the candor of the argument, insisting on this ground, we have carefully examined the whole testimony in the record, in reference to the accuracy of this position, but are unable to discover any good reason in the testimony to doubt for a moment the correctness of the verdict, or the judgment of the court refusing a new trial.

The circumstances of the case show deliberation, preparation, concert, to violate the laws of the land, and desecrate the sanctity of domestic peace and privacy. That, in the prosecution of that unlawful purpose, the defendant, with others, his relation and friends, went to the residence of the deceased and her brother, William Smith, then both residing with their father and mother. And, even according to the account of his own witness and accomplice, Wooley, when respectfully approached by William Smith, answering to his call at the gate, " told him he wanted nothing to do with him—wanted to see the old man; " according to the old man Smith's testimony, as well as other witnesses, defendant commenced the difficulty, and made the assault upon Smith, who was wholly unarmed, shot him

twice, shot at him a third time, then turned from him, rushed in an opposite direction toward the deceased, who, in her natural indignation at the outrage committed on her brother, only said to him, "You had better be getting away from here," and shot and killed her.

The proof is positive, both by his own confession and the testimony of several eye-witnesses, that *he* did the act. The circumstances all show that no one else could have done it, if the testimony be true. We can see no pretence for the defense that it was done *accidentally* by him; or for the more inconsistent one, that it was not done by him, but by some one else having a rifle.

We think the verdict of the jury was not only warranted by the testimony, but imperatively demanded by the atrocity of the crime it developed; and, while we lament the necessity which invokes our agency in the dreadful doom we are called to pronounce, as the ministers of the law, on the wretched offender, we still feel admonished by that very necessity, that in our firm and faithful adherence to the rigorous enforcement of its precepts, is to be found the only safety of good citizens, the security of home, and even protection to its helpless inmates.

Let the judgment be affirmed.