## Wytheville,

### HASH v. COMMONWEALTH.

July 2d, 1891.

1. CRIMINAL PROCEEDINGS—*Murder—Indictment.*—Motion to quash joint indictment against two persons on the ground of omission to insert copulative conjunction "and" between their names, is properly overruled, where a comma is placed after first name.

2. IDEM—*Instructions.*—Where there is no evidence in record tending to establish the proposition contained in an instruction; and an instruction undertaking to recite the evidence, but giving only a portion and withholding the rest;

HELD:

Erroneously given.

3. IDEM—*Pretence—Unlawful act.*—An instruction that "a man cannot in any case justify the killing of another upon *the pretence* of self-defence unless he be without fault in bringing on the necessity of so doing upon himself"—

HELD:

Improper, because the word "pretense" impliess *groundlessness*, and is calculated to prejudice the jury against the theory of necessary self-defence relied on by the accused. The word "plea" should have been used instead of "pretense"; and because the true doctrine is that although the slayer provoked the combat, or produced the occasion, yet, if be done without any felonious intent, intending, for instance, merely an ordinary battery, or trespass, the accused may avail himself of the plea of self-defence.

4. IDEM—*Trespass—Removal of line-fence—Plea of self-defence.*—Where accused had built a fence upon the line between his land and that of deceased, and it had been so used for a number of years, and deceased had notified accused not to remove it, the removal thereof would be nothing more than a trespass. But if the fence had been built by the accused on his own land, such removal would not be a tortious act at all. And in either event, if, to prevent such removal, deceased had made an

attack upon accused with a deadly weapon, under circumstances calculated to excite in the latter's mind a reasonable apprehension of death or great bodily injury to himself, under which he kills his assailant, he would be entitled to avail himself of the plea of self-defence. An instruction to the contrary ;

HELD :

Erroneous.

Error to judgment of circuit court of Grayson county, rendered October 31, 1890, whereby the plaintiff in error, Columbus Hash, was sentenced to the penitentiary for six years, in accordance with the verdict of the jury found on an indictment charging him with the murder of Anderson Rutherford. On the 3d day of June, 1890, Columbus Hash and Rowan Hash were jointly indicted in the county court of Grayson county for the murder of Anderson Rutherford, in said county, and, on their arraignment in said county court, the prisoner, Columbus Hash, demanded to be tried in the circuit court of said county ; whereupon he was remanded for trial in said court, and the proceedings had in said county court were duly certified to said circuit court.

The prisoner, by his counsel, moved the court to quash the indictment, but the court overruled the motion.

At the trial the attorney for the commonwealth asked the court to give to the jury six instructions, the first, second, third, and fourth of which were given without objection, but the court refused the fifth and sixth of the instructions, and gave in lieu thereof two others, of its own motion, which in the record are designated by corresponding numbers ; to the giving of which two instructions the prisoner, by his counsel, excepted. And the prisoner, by his counsel, asked the court to give to the jury ten instructions, to the seventh and eighth of which the attorney for the commonwealth objected, which objection the court sustained, and refused to give said seventh and eighth instructions, but gave all the others, so asked for by the prisoner ;

and to the action of the court refusing said seventh and
eighth instructions the prisoner, by his counsel, also ex-
cepted. All the instructions asked for on both sides, as well
as those given by the court in lieu of instructions five and six,
asked for by the attorney for the commonwealth, and instruc-
tions seven and eight, asked for by the prisoner, and refused by
the court, are set forth in the one bill of exceptions taken by
the prisoner to the rulings of the court objected to; and in the
same bill of exceptions the court certifies all the evidence
adduced at the trial.

The jury returned the following verdict: "We, the jury,
find the accused, Columbus Hash, guilty of murder in the
second degree, and fix his confinement in the state peniten-
tiary for a term of six years." And thereupon the prisoner,
by his counsel, moved the court to set aside the verdict and
grant him a new trial, upon the ground that the same was
contrary to the law and the evidence, and for other causes, but
the court overruled the motion, and refused to set aside the
verdict and grant a new trial, and thereupon proceeded to pro-
nounce sentence upon the accused in accordance with the ver-
dict of the jury; and to such ruling and judgment the
prisoner, by his counsel, also excepted, and on application
obtained from one of the judges of this court a writ of error
and *supersedeas* to said judgment.

*J. W. Hackler* and *Robert Crockett*, for plaintiff in error.

*Attorney-General R. Taylor Scott* and *R. Carter Scott*, for com-
monwealth.

RICHARDSON, J. (after stating the case as above), delivered
the opinion of the court.

The several objections taken by the plaintiff in error to cer-
tain rulings of the trial-court are comprehended in the one

Opinion.

question, Did the court correctly propound the law, as applicable to the evidence in the case, as respects the ruling complained of?

The first assignment of error is to the action of the court overruling the prisoner's motion to quash the indictment. The objection to the indictment is that it is insensible and uncertain as to the number of persons charged with the offence set forth. The record, aside from the indictment itself, shows that the indictment was a joint indictment against Columbus Hash and Rowan Hash for a felony. But on looking to the indictment itself we find that it charges that the offence was committed by " Columbus Hash, Rowan Hash," omitting the copulative conjunction " and." After the usual formula, the indictment sets forth : " That Columbus Hash, Rowan Hash, on the —— day of May, 1890, in the said county of Grayson, and in the jurisdiction of said court, with force and arms, in and upon the body of one Anderson Rutherford, in the peace of the said commonwealth, then and there being, feloniously, wilfully, and of their malice aforethought, did make an assault, and the said Columbus Hash, Rowan Hash, a certain pistol of the value of two dollars, then and there charged with gunpowder and leaden bullets, which said pistol they the said Columbus Hash, Rowan Hash, in their right hands then and there had and held, then and there feloniously, wilfully, and of their malice aforethought, did discharge and shoot off, to, against, and upon the said Anderson Rutherford, and that the said Columbus Hash, Rowan Hash, with the leaden bullets aforesaid, out of the pistol by the said Columbus Hash, Rowan Hash, discharged and shot off, as aforesaid, then and there feloniously, wilfully, and of their malice aforethought, did strike, penetrate, and wound the said Anderson Rutherford, in and upon the head of him, the said Anderson Rutherford, giving to him, the said Anderson Rutherford, then and there, with the leaden bullets aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid, by the said Columbus

Hash, Rowan Hash, in and upon the head of him, the said
Anderson Rutherford, one mortal wound, of which said mortal
wound he, the said Anderson Rutherford, from the —— hour
of the evening of the —— day of May, 1890, to the —— hour
of the evening of that day, in the year aforesaid, did languish,
and languishing did live, on which said evening of the ——
day of May, in the year aforesaid, the said Anderson Ruther-
ford, in the county aforesaid, of the said mortal wound died;
and so the jurors aforesaid, upon their oaths aforesaid, do say
that the said Columbus Hash, Rowan Hash, the said Anderson
Rutherford, in manner and form aforesaid, feloniously, wil-
fully, and of their malice aforethought, did kill and murder,
against the peace and dignity of the commonwealth of Vir-
ginia."

The insistence is that the indictment is insensible and uncer-
tain as to the number of persons charged, by reason of the
absence of the conjunction " and " whenever the words
" Columbus Hash, Rowan Hash " occur, in the indictment.
We are, however, clearly of the opinion that the objection is
not well taken.   It will be observed that in every instance in
which the expression occurs in the indictment, the words
" Columbus Hash " are followed by a comma, and then come
the words Rowan Hash.   The use of the comma clearly indi-
cates that the words " Columbus Hash " represent the name
of one of the two persons jointly indicted, and the words
" Rowan Hash " represent the name of the other, and that, by
necessary intendment, the meaning is the same as if the ex-
pression had been written *Columbus Hash and Rowan Hash.*

It is true that in speaking of the pistol from which the fatal
shot was fired the indictment proceeds—" which said pistol
they, the said Columbus Hash, Rowan Hash, in their right
hands, then and there had and held," &c.   If we take but a
superficial view of the thing, we are almost irresistably led to
the conclusion that it is senseless to say that, in the midst of a
heated and deadly conflict, two persons could, at the same

time, hold in *their right hands* and fire the same pistol; but, however improbable such an assurance may be, it cannot be said to be impossible. Bishop says: "Where the indictment is against more defendants than one for an offence committed by them jointly, it need not employ the word jointly in describing the offence. According to the forms generally used, it simply means the defendants, and says they did so and so. Offences are in law several, even when jointly committed; and such an allegation, therefore, is equivalent to saying that each defendant did the criminal act." 1 Bish. Cr. Pro. § 471.

We are, therefore, of opinion that, while the indictment is awkwardly drawn, it is nevertheless sufficient. It, with sufficient certainty, charges that Columbus Hash and Rowan Hash committed the criminal act therein set forth. Hence, if the proof sustains the charge in the indictment, they are both guilty, no matter which of them fired the fatal shot.

The real questions presented by the record arise upon certain instructions given by the court on behalf of the commonwealth, and on certain others asked for by the prisoner, but refused by the court. But before considering these questions it is necessary to call attention to the material evidence in the cause, so as to test, in the light of the legal principles applicable thereto, the correctness of the instructions in question.

The plaintiff in error, Columbus Hash, and the deceased, Anderson Rutherford lived in a few hundred yards of each other in the county of Grayson, were adjoining land-owners, and got at outs about a division fence which had been recognized as the line fence between them. In the evidence certified by the court, it is distinctly stated in the testimony of Isham Rutherford, a son of the deceased, and the only person that testified on behalf of the commonwealth, who was an eye witness to the homicide, that the fence was built by the plaintiff in error, and that the deceased had no interest in the fence. The plaintiff in error determined to move this fence a short

distance on his side, and he forbade the deceased from joining his fence thereto. And in turn the deceased forbade the removal of said fence. The plaintiff in error, with his two brothers, on Thursday preceding the Saturday on which the homicide occurred, proceeded to move the fence, and on Saturday the day of the homicide the work was complete, except the erection of a pair of draw-bars, for which a space remained open. On the last named day (Saturday) the deceased and his son Isham came to the open space in the fence where the plaintiff in error, aided by his said two brothers was about to erect the draw-bars, and very soon the deadly conflict arose, which resulted in the death of the deceased, Anderson Rutherford. Only three persons were present. They were Isham Rutherford, the son of the deceased, and Seabert Hash and Rowan Hash, brothers of the plaintiff in error. At the risk of tediousness we will give their evidence in full, as certified by the trial court.

Isham Rutherford, the son of the deceased, testifies as follows : " That he is a son of Anderson Rutherford, and that he was present when his father, the said Anderson Rutherford was killed. Just after 12 M. we passed out to see if any stock was in our field; Mr. Hash and his two brothers were fencing; father says, I see you are building some fence; my ould pa studied a little while and said, I will build me a piece of fence; they then came up to us, Columbus Hash said to my old pa, what made you present your gun on me this morning, my poor old pa told him he was a liar he never drew it; the prisoner said you are a g—d d—n liar; prisoner then drew his pistol, my poor old pa says I have no weapons, prisoner then shot him, and in a minute Rowan Hash drew a pistol; the ball struck my father in the head, he (A. Rutherford) fell with his head to the N. E. I then ran home to tell my folks, when I got back my poor old pa was lying on the side of the road, twenty-two steps from where he was shot, was lying on his back, he lived till after dark. The tragedy occurred about 1 P. M., Rowan

Hash, Seabert Hash, deceased, the prisoner and myself were present. They were propping up the fence down at the lower end of the fence they had moved; my poor old pa said I will get me two or three hands and build me a fence, prisoner said nothing to that but went to driving stake, then threw his axe down and started at pa. Hash says to my poor old pa, what made you draw your gun on me this morning? Pa told him he was a liar he never done it; prisoner replied you are a g—d d—n liar; prisoner drew his pistol, my poor old pa said he had no weapons and just stood there; there was gum stump where he (deceased) fell and open woods around. When the conversation commenced my poor old pa and myself were at the draw-bars close to the road, they were fifty yards north of us; when we went up there we went the path to the bars. The chestnut tree was twenty-two steps from where my poor old pa was shot; when we left the path we started towards home and went a little above the path; we were near the Hash's above the path, they were below us, we first went above it; after while my sister Tinsey and myself came back; father was on bank of the road near the bars, I don't know how he got there; Aunt Peggy Rutherford and William Lovelace came next; my sister and myself came back to where pa was together, we walked back; I had to run about 200 yards to tell my folks poor old pa was killed; I saw my sister Tinsey coming walking, after she came up we walked back together; my father had no interest in the fence; Mr. Hash built the fence, the fence was to the lower side of the draw-bars; my father had no weapon except a little old knife, I never saw the knife; he had nothing in his hand when the prisoner shot him.

On cross-examination, this witness testified in the remarkable manner following: "My father and myself started about 1 P. M. to where the tragedy occurred; we were one-half hour going; we had a clock at our house; it is 250 yards from our house to where my poor old pa was killed; we went up the hill from our house to top of the hill and then went the old

path; the first place we stopped at was the draw-bars, near the chestnut tree; the way I know it was 1 o'clock when my poor old pa was killed was because I looked at our clock, for we owned one and had it in our house on the day of the killing; I know it was twenty-two steps from the gum stump to where my poor old pa fell, for I stepped it; when I stepped it I only stepped a foot at a time; I don't know how many feet there are in a yard, but they tell me there are three feet in a yard; I don't know how many yards it takes to make a foot, but they tell me it takes three feet to make a yard; when I went home after the pistol shot I was gone but a minute or two; I then went back in company with my sister, Tinsey, and I got there first and she was just behind me; I do not know why I passed the gum stump and went to the road; but he was shot at the gum stump; my pa was fifty-seven years of age; no one told me to call him my old pa."

Such is the incredible story told by Isham Rutherford, the son of the deceased, and the only witness for the common-wealth who was present at the time of the tragedy. It is, on its face, unnatural, senseless, self-contradictory, and unworthy of credit, and is, in material particulars, flatly contradicted, not only by his two sisters, Tinsey Rutherford and Nellie Rutherford, who testified on behalf of the commonwealth, but by other witnesses and by the surrounding circumstances. There is but little in the evidence of Tinsey and Nellie Rutherford that is material; and, in this connection, it need only be referred to in so far as it contradicts a material statement made by their brother, Isham, as to the time of day when the homicide occurred. His statement substantially is that he and his father started out, about half past 12, to see if there was any stock in the field; that they went by the path leading from the house to the draw-bars near which the killing occurred; and then, after giving his account of how the conflict came about, he adds that his father was killed about 1 o'clock P. M.; and in his cross-examination he says, "the first

place we stopped at was the draw-bars, near the chestnut tree; the way I know it was 1 o'clock when my poor old pa was killed was because I looked at our clock, for we owned one and had it in our house on the day of the killing." But both Tinsey and Nellie Rutherford testify that there was no clock in the house on the day of killing, the latter stating that they never had one.

The theory of the defence was, that at the time the fatal shot was fired by the accused the deceased was making a sudden, fierce, and murderous assault upon him, with a dangerous and deadly weapon, and that the killing was done in necessary self-defence; and, from the evidence disclosed by the record, such theory was supported by an overwhelming preponderance of evidence. It was, then, of the utmost importance for the commonwealth to show both the time and manner of the killing, and this was attempted by her chief witness, Isham Rutherford, who fixes the time at about 1 o'clock, and to support his accuracy he says that, on leaving the house with his father he looked at the clock; that it was then half-past 12; that it took them half hour to walk to the draw-bars, where they first stopped, and that the killing occurred at about 1 o'clock; when his two sisters, Tinsey and Nellie, both testify that there was no clock in the house on the day of the homicide, and Nellie says they never had one. And the undisputed evidence is that the homicide occurred nearly 4 o'clock in the afternoon.

Again this witness testifies positively, in his examination in chief that his father, the deceased, was shot and fell at the gum stump, twenty-two steps from the draw-bars and in the direction of his house; that he (witness) "ran to the top of the hill to tell his folks that poor old pa was killed; that he was gone only a minute or two"; and that on his return he found his father, the deceased, lying near the road, twenty-two steps from the gum stump. For some unexplained reason, this witness thus sought to create the impression that the accused had,

after shooting the deceased, moved his body back to the road-side near the draw-bars, the obvious purpose being to show that the deceased had been pursued to the gum stump and there shot. The story is a most improbable one. Its ready refutation is found in the evidence of the witness himself. He says he was gone only a minute or two, in which time it is not reasonable to believe that the body could have been moved, if, indeed, the thought of doing so could have occurred to the accused under the circumstances. Moreover, there was direct, independent and uncontradicted evidence that this witness was, for only some fifty yards distance traversed by him in going to tell what had occurred, out of view of the gum stump; and from his own statement that he was gone only a minute or two, he could not have been out of sight of the gum stump for as much as a half a minute. And yet, after making this incredible statement that the deceased was shot and fell at the gum stump, and that the body was moved back to the road-side, twenty-two steps distant, this same witness, in his cross-examination, says: "I know it was twenty-two steps from the gum stump to where my poor old pa fell, for I stept it; when I stept it I only stept a foot at a time." Obviously this witness was either a part simpleton or one wholly incompetent to testify; and it would seem that but little credit could be given to his statement by any upright judge presiding at a trial involving the life of a human being.

Seabert Hash and Rowan Hash, brothers of the plaintiff in error, were the only other witnesses to the deadly conflict. Seabert Hash is certified as saying: "I am sixteen years old. I remember the day deceased was killed; I was there; I went to help Col.; help fix up his fence. As we got done, A. Rutherford came up on hill near a chestnut tree. Rutherford came to the bars and asked brother if he was going to put up bars; told him he need not do it, that he would build a fence. Rutherford came to the chestnut tree and was sighting down the fence, and as the accused passed through the draw-bar

place Rutherford said to him : ' Are you going to put up draw-bars here ? ' Accused said, ' Yes.' Rutherford said, ' You need not do it ; I will get me some hands and build me a fence.' Accused said, ' Build as much as you please, but build it out-side of the row of stakes which you see I have driven in the ground.' 'Rutherford replied, ' I will build it where I d—d please, and I am going to have this line run.' Accused said, ' Run it as much as you please, so you pay for it.' Rutherford said, ' I will make you help pay for it.' Accused said, ' Did I not offer you everything fair, even after you drew your gun twice on me this morning.' Rutherford said, ' You are a d—d liar, I didn't draw my gun on you.' Accused said ' You are another.' Rutherford said, ' You are a d—d liar, G—d d—n you,' and here drew his knife open, from his right pants pocket, and struck the accused, cutting his pants and drawers about the waist-band, and cutting his left arm between the elbow and shoulder. And the accused, retreating from the time the knife was first drawn until he was down to a fence, when he raised up his left hand to ward off another blow of said Rutherford, and caught said blow with his arm and hand raised, between the thumb and first finger, and at this time the accused had drawn his pistol, raised it and fired, and the ball took effect in the forehead, above the left eye of Rutherford, and he fell to the ground. And the accused received a severe cut between the thumb and forefinger just before or about the time Rutherford was shot. Rutherford fell and we left. I went after our coats, Rowan after axe, and Columbus went on down the road. Isham Rutherford was near deceased when shot. He went off towards home. None of us touched the body after it fell. The deceased was shot by the side of the road, and was left lying there. The body was lying on its back. Saw no one about the gum stump. Didn't see de-ceased's hat after he was shot. Don't know how long Ruther-ford had been there before difficulty. Rutherford first asked Columbus if he was going to build a pair of bars there.

Defendant replied, ' Yes.' Deceased said, ' If you do, build it over yours.' We went out there just after 12 o'clock to fix up fence. From Hash's to where the difficulty occurred was about 100 yards. There were thirty-one panels of fence. Had knife in his hand when he fell. I saw knife after he fell. Stakes were put there by Columbus on the line. Deceased cut Hash three times across body, on arm and on hand."

On cross-examination this witness said, in substance : " I and my brother were helping Columbus make fence. I was twenty steps behind when difficulty began, and heard what was said. Accused asked deceased if he (Hash) had not offered to do all that was fair and right, even after he (Rutherford) drew his gun on him. That deceased drew the knife out of his pocket. I saw him. I saw part of the handle and the blade, and can swear that it was the knife exhibited in court. He had cut my brother three times when he shot him."

Rowan Hash, in his account of how the homicide occurred, said : " Rutherford came to the chestnut tree, and was sighting down the fence, and, as the accused passed through the draw-bar place, Rutherford said to him, ' Are you going to put up draw-bars here ? ' Accused said, " Yes." Rutherford said, ' You need not do it; I will get me some hands, and build me a fence.' Accused said, ' Build as much as you please, but build it outside of the row of stakes which you see I have driven in the ground.' Rutherford replied, ' I will build it where I d—d please, and I am going to have this line run.' Accused said, ' Run it as much as you please, so you pay for it.' Rutherford said, ' I will make you help pay for it.' Accused said, ' Did I not offer you everything fair, even after you drew your gun twice on me this morning ? ' Rutherford said, ' You are a d—d liar, I didn't draw my gun on you.' Accused said, ' You are another. Rutherford said, ' You are a d—d liar, G—d d—d you,' and here drew his knife, open, from his right pants pocket, and struck the accused, cutting his pants and drawers about the waist-band, and cutting his left arm, between the elbow and shoulder,

and the accused retreating from the time the knife was first drawn until he was down to a fence, when he raised up his left hand to ward off another blow of said Rutherford, and caught said blow, with his arm and hand raised, between the thumb and first finger; and at this time the accused had drawn his pistol, raised it, and fired; the ball took effect in the forehead, above the left eye of Rutherford, and he fell to the ground, and the accused received a severe cut between the thumb and fore-finger, just before or about the time Rutherford was shot." He further testified, in substance, that he (Rowan Hash) had no pistol; that the body of the deceased was not moved after he fell, and that he fell near the road, about nine steps from the new draw-bar place; that accused gave back when deceased was striking at him. He further says that he saw deceased draw the knife from his right pocket; that it was a large knife, with buck-horn handle, and that the knife was gripped in the hand of deceased after he fell; that deceased did not cut accused to the hide on the body, but cut his arm, and it bled freely; that he (witness) was not about the gum stump that day, and that the stump was about thirty steps from draw-bars; that there was no difficulty at the stump, and that witness did not see the accused there that day; and that the chestnut tree is about three or four panels of fence from the bars.

These two witnesses, who were introduced in behalf of the accused, substantially agree in their statements as to how and where the homicide occurred. They both testify that the deceased was shot and fell at or near the draw-bars. The accused also testified, and his statement agrees substantially with that of Seabert and Rowan Hash; and all of them concur in saying that the deceased came first to the chestnut tree, from which point he was sighting down the fence; that he then came to the draw-bars, where the conversation was commenced by him with the accused, and near which point he was shot and fell.

Such being the theory of the defence, what was that of the prosecution? Briefly recapitulated it may be stated thus:

Isham Rutherford, the son of the deceased, and only witness introduced for the commonwealth, who was present, and saw what occurred, says that he and the deceased went by the path from the house to the draw-bars, near the chestnut tree. This was said on his cross-examination. He had, on his examination in chief, made this statement: "They" (meaning the accused and his two brothers) "were propping up the fence down at the corner end of the fence they had moved. My poor old pa said, 'I will get me two or three hands, and build me a fence.' Prisoner said nothing to that, but went to driving stake; then threw his axe down, and started at pa. Hash says to my poor old pa, 'What made you draw your gun on me this morn?' Pa told him he was a liar, he never done it. Prisoner replied, 'You are a G—d d—n liar.' Prisoner drew his pistol. My poor old pa said he had no weapons, and just stood there. There was gum stump where he (deceased) fell and open woods around. When the conversation commenced my poor old pa and myself were at the draw-bars, close to the road; they were fifty yards north of us. When we went up there we went the path to the bars. The chestnut tree was twenty-two steps from where my poor old pa was shot. When we left the tree we started towards home," &c.

He (Isham Rutherford) had just previously, in his statement in chief, made a less circumstantial but much clearer statement, in which he said: "Mr. Hash and his two brothers were fencing. Father says, 'I see you are building some fence.' My poor old pa studied a little while, and said, 'I will build me a piece of fence.' They then came up to us. Columbus Hash said to my old pa, 'What made you present your gun on me this morning?' My poor old pa told him he was a liar, he never drew it. The prisoner said, 'You are a G—d d—n liar.' The prisoner then drew his pistol. My poor old pa says, 'I have no

weapons.' Prisoner then shot him, and in a minute Rowan Hash drew a pistol," &c.

Take all the variant statements of this witness together, and it is impossible to extract from them any meaning other than that the fatal encounter occurred at the draw-bars, and that the deceased was there shot and there fell. He distinctly states that the conversation which led up to the conflict of blood was commenced by his father, the deceased, at the draw-bars. He does not intimate that there was any lull in the conversation from its commencement until the fatal shot was fired and the deceased fell. Nor is it possible, from his statement, that the deceased ever, of his own volition, left the draw-bars, where, according to this witness, he stood unarmed and was shot. He nowhere speaks of the deceased going from the draw-bars to the chestnut tree; nor does he intimate that the deceased was either pursued or intercepted and shot; but after showing that the deceased must have been shot at or near the draw-bars, he does say that when deceased left the tree (chestnut tree), "We started towards home," and that "there was gum stump where deceased fell."

In this state of the testimony the trial judge, by certain instructions given or refused, propounded the law in the remarkable manner now to be inquired into.

As already stated, of the six instructions offered by the commonwealth the court gave the first four, to which there was no objection, but in lieu of the last two it gave two others, of which the first is as follows:

Fifth. "If the jury believe from the evidence that deceased was going from draw-bars towards his home, and had got to a point at which a gum stump stands, and the accused advanced towards and came near to him, and drew from his person a pistol, and that the pistol up to that time had been concealed, and that the accused then and there, with a willful, deliberate and premeditated intent to kill deceased, shot him fatally with the pistol, and that the deceased was making no assault

nor doing any overt act indicative of an intention to make an assault on the accused, then the accused would be guilty of murder in the first degree."

In the light of the evidence contained in the record, this instruction is pregnant with error, there being at least two sound objections thereto. First. There is no evidence in the record which tends to establish the main proposition contained in the instruction. The only facts testified to by Isham Rutherford, the only witness introduced by the commonwealth, who was present when the homicide occurred, tending to that result, is the fact that the accused drew his pistol and shot the deceased, and that he fell at the gum stump. There is no evidence that the deceased, after the commencement of the conversation at the draw-bars, was going home and had got to the gum stump, and that the accused advanced towards and came near to him, and (then) drew from his person a pistol, and that the pistol up to that time had been concealed. On the contrary, as already shown, this witness testified that when the conversation commenced "we were at the draw-bars;" that the deceased addressed a remark to the accused and his brothers; that they then came up to us; that then the lie was given and returned, and that the accused then drew his pistol and shot the deceased. There is nothing whatever tending to show that the deceased was either pursued or intercepted by the accused, and was shot by him with a pistol, which, up to the time of his overtaking the deceased, had been concealed, as is erroneously assumed in the instruction. Hence, the instruction was irrelevant, well calculated to mislead the jury, and doubtless did mislead them. Second. The instruction, in effect, suppresses the evidence tending to support the theory of defence set up by the accused. It is a rule too well settled to need the citation of authorities, that where an instruction undertakes to recite the evidence, it must not garble the same by giving a portion of it and withholding the rest, the well established principle being that the accused has a right to a

full and correct statement by the court of the law applicable to the evidence in his case, and that any misdirection by the court in point of law on matters material to the issue is ground for a new trial. Whar. Crim. Pl. and Pr., §§ 709–10. *Rhea* v. *Trotter*, 26 Gratt. 585; *Honesty's Case*, 81 Va. 283.

In the present case there were other persons present at the homicide and who testified at the trial. The court should not have based its instruction as it did, upon the testimony of the only witness whom the attorney for the commonwealth saw fit to introduce. · It should have recited the testimony of Seabert Hash, Rowan Hash and the accused, and have based a hypothetical alternative instruction upon their testimony, and thus have presented the theory of the defence as well as that of the prosecution, so that the jury might be enabled to have before it the whole case and to adopt the one theory or the other, according to their opinion, as to the credibility of the respective witnesses.

In lieu of the sixth instruction asked for by the attorney for the commonwealth, the court, of its motion, gave the following:

" The court instructs the jury that a man cannot in any case justify the killing of another upon the *pretence* of self-defence, unless he be without fault in bringing the necessity of so doing upon himself. Therefore, if the jury believe from the evidence that the accused built the fence spoken of by the witnesses, running north from the draw-bars mentioned by the witnesses, upon the line between himself and the deceased so that it rested partly on the land of each, and that the deceased joined to the same at the draw-bars, thereby inclosing his premises, and that said fence had been used as a line fence between the accused and deceased for a number of years, and that deceased had notified accused not to remove said fence, and that the accused afterwards, on the day of the homicide, armed himself with a pistol, and in company with two brothers went to the fence with intent to remove the same with force, if necessary, and

did remove said fence, then he was guilty of an unlawful act, and if the deceased came upon the premises while the unlawful act was being committed and then and there on account thereof a conflict arose in which the accused killed the deceased, then the accused cannot avail himself of the plea of necessary self-defence. But the court instructs the jury further, that if they believe from the evidence that the accused had reasonable ground to fear that deceased might kill him or do him some grave bodily harm while he was engaged in the exercise of his lawful right of removing said fence, then the accused might lawfully arm himself for the purpose, if it became necessary, of protecting his life and person. And if the accused did, after being notified by the deceased not to remove said fence, on the day of the homicide and in company with two brothers, after arming himself with a pistol proceed to remove said fence with no intent to use said pistol except only to protect his life and person while engaged in the exercise of his lawful right, then the accused was not engaged in an unlawful act; and if the deceased came upon the premises while the accused was so engaged in removing the fence, or after its removal, and on account thereof a conflict arose, then the accused would not be precluded from availing himself of the plea of self-defence if the conflict was of such a character, and the conduct of the accused in the conflict was such as to make the killing of deceased, by the accused, excusable homicide."

This instruction is palpably erroneous in several respects. The law, under circumstances such as characterize the present case, asserts no such cruel and inhuman doctrine. First. The word "*pretence*" in the first paragraph of the instruction implies sham, falsity, and groundlessness; and, now as it is in the outset of the instruction, it gives color to all that follows, and in effect says to the jury that the defence set up by the accused is a mere false pretence, and could but prejudice the minds of the jury against the theory of necessary self-defence relied on by the accused. Instead of the word "*pretence*,"

thus employed in the introductory sentence of the instruction, the word "*plea*" should have been used.

It is often the case that the circumstances attending a homicide are such that the court may, in an instruction to the jury, based on the evidence adduced at the trial, properly employ the word "*pretence*," as, for instance, where the evidence strongly tends to show that the accused sought and brought about the deadly conflict in order to have a pretext for killing his adversary or doing him great bodily harm. In such case it would not only be the right but the duty of the court to propound to the jury a hypothetical case, based upon such evidence, and to say to them that, if from the evidence they believe the case supposed in the instruction to be true, then the accused is guilty of murder, and that he cannot justify such killing under the "*pretence*" of necessary self-defence. But this is widely different from saying, as the court did in the paragraph under consideration, that " a man cannot in any case justify the killing of another upon the pretence of self-defence unless he be without fault in bringing the necessity of so doing upon himself."

Not only does this part of the instruction assert a proposition that cannot be entertained, as will presently be shown, but in its frame and structure it is paradoxical and absurd. It asserts in one sentence two irreconcilable propositions : first, that no man can justify the killing of another upon the pretence of self-defence unless he be without fault in bringing the necessity of so doing upon himself; and, second, by necessary implication, that a man may, in any case, justify the killing of another upon the *pretence* of self-defence, if he be without fault in bringing the necessity of so doing upon himself. Obviously no question could arise in either case as to *pretence*. The absurdity is too palpable to need comment.

But the paragraph in question goes further and asserts a proposition which, in effect, strikes at some of the most vital principles of criminal jurisprudence touching the law of self-defence.

In discussing the question, when killing in self-defence is permissible, Bishop says: "The rule is commonly stated in the American cases thus: If the individual assaulted, being himself without fault, reasonably apprehends death or great bodily harm to himself, unless he kills his assailant, the killing is justifiable." 1 Bishop Cr. Law (6th ed.), § 865.

"There are two kinds of permissible defence of person or property. The one extends, when necessary, to the taking of the aggressor's life; and this is called the perfect defence. The other, or imperfect defence, does not permit him who employs it to go so far, but he may resist trespass on his person or property to an extent not exactly the same in all circumstances, yet not involving the life of the trespasser; and this is called the imperfect defence. 1 Bish. Cr. Law, §§ 840, 841.

The same eminent author says: "The right to defend one's person or property proceeds from necessity. And, however complete this right may be, or however far the law permits it to be carried, it stops where necessity ends. The party making the defence may use no instrument and no power beyond what will simply prove effectual. Thus, though it is lawful for one to oppose another who is committing felony, even to the taking of his life, yet, if there is no obstacle to his arrest, the shooting of him in the felonious act, instead of having him arrested, is a felonious homicide. And, while it is lawful to kill a man in self-defence, still his mere assault with the fist will not justify the instant taking of his life by a stab; and to thus resort to a defence wholly unnecessary is murder. It is not lawful to kill another who even meditates the taking of one's life till some overt act is done in pursuance of the meditation; in other words, till the danger becomes immediate. The steps necessary may be taken, and no more. Thus, again, a man who expects to be attacked should first employ the means in his power to avert the necessity of self-defence, and, until he has done this, his right of self-defence does not arise. Nor can a man avail himself of a necessity which he has knowingly

and wilfully brought upon himself. Yet one assaulted by another who has threatened to kill him is not bound to run in the particular instance, thus increasing his danger by encouraging the assailant to repeat the attempt when he will be less prepared to resist." *Ib.*, §§ 842, 843 and 844. In support of these propositions, which are founded in reason, justice, and humanity, the author cites very numerous authorities.

In the above summary we have a clear statement of the law with respect to one's right to defend his person, and how far that right may be carried. Elsewhere the same author gives a summary showing the right to defend one's property. He says: " One, in defence of his property, must not commit a forcible detainer, a riot, or any like crime. He must not kill the aggressor; but, if the question comes to this, he must find his redress in the courts. If the wrongful act is proceeding to a felony on the property, he may then kill the doer to prevent the felony, if there is no other way; otherwise this extreme measure is not lawful. And the defence may be such, and such only, as necessity requires, of course, within the limit which forbids the taking of life. Therefore a man commits a felonious homicide who inflicts death in opposing an unlawful endeavor to carry away his property. There is here the right to resist, but not to the taking of life."

In the above formula we have the doctrine concisely stated in respect to both the perfect and the imperfect right of self-defence, and we have, also, a clear recognition of the essential distinction between the two. The perfect right of self-defence extends, when necessary, to the taking of the aggressor's life; but it cannot be resorted to for the protection of property, except where it consists of the castle, or a felony is being committed on it; while, on the other hand, the imperfect right of defence is permitted as well of the property as the person. Hence, a man may lawfully defend his property in possession by any degree of force, short of taking of life, necessary to make the defence

effectual, unless it amounts to a riot, a forcible detainer, or some other like crime. Yet he cannot proceed therein beyond what necessity requires. 1 Bishop Cr. L., §§ 860–861.

The doctrine of perfect and imperfect defence is well illustrated by Bishop, as follows: " If, without provocation, a man draws his sword upon another, who draws in defence, whereupon they fight, and the first slays his adversary, his crime is murder. For he who seeks and brings on a quarrel, cannot, in general, avail himself of his own wrong in defence. But where an assault, which is neither calculated nor intended to kill, is returned by violence beyond what is proportionate to the aggression, the character of the combat is changed; and if, without time for his passion to cool, the assailant kills the other, he commits only manslaughter."

Horrigan & Thompson, in their cases in self-defence, p. 227, in a note to *Stoffer* v. *State*, 15th Ohio St. 47, cited in *State* v. *Partlow*, 90 Mo. 608, give an admirable summary of the authorities on this subject, as follows: " If he (the slayer) provoked the combat or produced the occasion, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. But if he provoked the combat, or produced the occasion, without any felonious intent, intending, for instance, an ordinary battery merely, the final killing in self-defence will be manslaughter only."

Here is a clear recognition of the doctrine, that although the slayer provoked the combat, or produced the occasion, yet, if it was done without any felonious intent, the party may avail himself of the plea of self-defence. In the case of *State* v. *Partlow*, *supra*, the learned judge, delivering the opinion, cites in support of this doctrine, *State* v. *Lane*, 4 Ired. 113; *Ray* v. *Smith*, 8 Car. & P. 160; *Slaughter's Case*, 11 Leigh, 680; *Murphy* v. *State*, 37 Ala. 142; *Adams* v. *People*, 47 Ill. 376; *State* v. *Hildreth*, 9 Ired. 429; *State* v. *Hogue*, 6 Jones' Law, 381; *State* v. *Martin*, 2 Ired. 101; *Atkins* v. *State*, 16 Ark. 568;

*Cotton* v. *State*, 31 Miss. 504; *Stewart* v. *State*, 1 Ohio St. 66; *State* v. *Hill*, 4 Dev. & Bat. 491; and 2 Bish. Cr. L., § 702, *supra ;* and by way of enforcing this well settled legal principle, the learned judge makes this remark : " Indeed the assertion that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose is guilty of murder, and cannot avail himself of the doctrine of self-defence, causes with it in its very bosom the inevitable corollary that if the quarrel be begun without a felonious purpose, then the homicidal act will not be murder.   To deny this obvious deduction is equivalent to the anomalous assertion that there can be a felony without a felonious intent; that the act done characterizes the intent, and not the intent the act.   The bare statement of such a doctrine accomplishes its own ample refutation ; a doctrine inconsistent with its premises and illogical in its conclusion. In the light of this well settled doctrine, it is manifest that the trial court erred egregiously in saying to the jury that " a man cannot in any case justify the killing of another upon the *pretence* of self-defence, unless he be without fault in bringing the necessity of so doing upon himself."

Recurring now to the rule laid down by Bishop, that if the individual assaulted, being himself without fault, reasonably apprehends death or great bodily injury to himself unless he kills the assailant, the killing is justifiable, the inquiry presents itself, what " fault " is it that will deprive a man of his plea of justifiable self-defence ?   This question has already been answered by the authorities cited.   It is the " fault " of seeking and directly bringing about the occasion for the killing, limited, however, by the intention with which the occasion was brought about.

Inasmuch, therefore, as the right of a party accused of a felonious homicide to avail himself of the plea of justifiable self-defence depends upon the intent with which he provoked the difficulty, and inasmuch as it is the doctrine of the law

that no man is to be punished as a criminal, unless his intent is wrong, and as the intent is a fact to be found by the jury, then in every case where the evidence creates any doubt as to the character of the intent, the court should instruct the jury as to the distinction between perfect and imperfect defence, as applicable to the particular circumstances attending the homicidal act of the accused. *Menley's Case,* 8 Am. State Reports, 478, and authorities cited.

Second. The second paragraph of said sixth instruction is to the effect that if the jury should believe that the accused had built the fence on the line between his land and that of the deceased, and that said fence had been used as a line fence for a number of years, and deceased had notified accused not to remove it, then the removal of the fence by the accused, under the circumstances, was an unlawful act, and that if the accused killed the deceased in a conflict on account thereof, then the accused could not avail himself of the plea of necessary self-defence.

This is unquestionably a misstatement of the law. Such removal of the fence could have amounted to nothing more than a mere trespass, if that; and if, to prevent such trespass, the deceased had made an attack on the accused with a deadly weapon, under circumstances calculated to excite in the mind of the latter a reasonable apprehension of death or great bodily injury to himself, can it be possible that to kill his assailant under such circumstances would deprive him of the right to avail himself of the plea of self-defence? Certainly not, as is shown by the authorities already referred to. A man may even draw his sword in a quarrel with his adversary; then on reflection may decline the fight and withdraw; but on being pursued may turn and, if necessary, may slay his pursuer in self-defence. But, while there was evidence tending to prove that the fence was on the land of the deceased and was recognized and used as the line fence, the overwhelming preponderance of evidence was to the effect that it was not

on the line, but was removed thereto; that it was built by the accused and that the deceased had no interest in it. Under such circumstances, was the removal of the fence a tortious act? We think not.

In Second Waterman on Trespass (Real Estate) it is said in respect to property in fences, that fences are a part of the freehold, and the fact that the materials of which they are composed are accidentally or temporarily detached without any intent in the owner to divest them from their use as a part of the fence, works no change in their nature. If I build a fence on my neighbor's land it is his, not mine; and the dominion which every man has over his own property gives him a right to remove it whenever he pleases. If it be useful to me as well as to him, and if I build it in consideration of his promise that it shall stand there permanently, and he removes it in violation of that promise, I may recover in an action on the contract, the value of my labor, and perhaps for the consequential injury; but I cannot maintain trespass.

In a note the author cites *Burrell* v. *Burrell*, 11 Mass. 294, which was an action of trespass for entering on the plaintiff's land and taking away a fence on the dividing line between premises owned by the parties respectively. The part of the fence removed by the defendant was made of rails; and he proved that he built it twenty-three years previous, and had ever since kept it in repair, and that, at the time of the alleged trespass, he took away the rails in order to replace the fence by a stone wall, which he built the following year, putting it nearer to his own land than the place where the fence rail stood. A verdict was found for the defendant in the court below, and the Supreme Court in sustaining it said: " The only question which could exist at the trial was whether the facts there testified were true; and the jury having decided that they were, the verdict was a necessary legal consequence. There is nothing in the report from which an entry on the plaintiff's land can be inferred, unless such entry was neces-

sary for the purpose of taking down the fence in order to rebuild it, which would not be tortious. The part of the fence assigned to the defendant to keep in repair was his property, so far, at least, that the removal of it for lawful purposes could not make him a trespasser; and we do not think there was any joint tenancy or tenancy in common of the materials of which the fence was composed."

That case, in its facts, as to the erection, ownership, and use of the fence, was almost precisely like the case here. If we apply to the evidence in the present case the principles applied under similar circumstance in that case, it is plain that the accused, in removing the fence in question, did no legal wrong to the deceased, and that there was nothing in the evidence upon which to base the direction to the jury contained in the second paragraph of the said sixth instruction, and the jury should not have been so instructed.

Third. The third paragraph of said sixth instruction, taken in connection with the second, was well calculated to mislead the jury and induce them to make the conviction or acquittal of the accused depend upon the decision of the question whether the accused had or not the right to remove the fence, whereas such right was wholly immaterial in considering his guilt or innocence, the undisputed testimony being that the fence had been removed before the deceased went to the scene of the conflict which resulted in his death; and the clear preponderance of evidence being to the effect that the deceased sought and, without any sufficient provocation, brought about the conflict which resulted so fatally to him, and made a fierce and murderous assault upon the accused with a deadly weapon, knife suddenly drawn, open, from his right pants pocket.

Fourth. The fourth and last paragraph of the said sixth instruction is amenable to the same criticism, and should not have been given.

On behalf of the accused ten instructions were asked for, all of which the court gave except the seventh and eighth.

The seventh instruction asked for by the accused, and refused by the court, is as follows :

" The jury are further instructed that the accused must have been without fault in bringing on the combat, and that he must not have provoked the combat, or produced the occasion for killing the said Anderson Rutherford, or doing him some great bodily harm.  But if they shall also believe that even if the accused was not without fault in bringing on the combat, or that he provoked the same, or produced the occasion, in order to have the pretext for killing said Rutherford, or doing him some great bodily harm ; yet, if they shall also believe that the accused fairly declined the said contest, by retreating as far as he could, then killed said Rutherford in self-defence, the killing was excusable, and they should acquit the accused."

We are of the opinion that this instruction correctly propounded the law, and there was evidence in the case tending to establish the proposition contained therein, and that the court erred in refusing to give it.

The eighth instruction asked for by the accused, and refused by the court, is as follows :

" If the jury shall believe from the evidence that Isham Rutherford, a witness called on by the prosecution, and sworn in court to give evidence in this case, testifies that he knew that the difficulty occurred between Anderson Rutherford, the deceased, and the accused, between the hours of 12 and 1 o'clock on the day that said Anderson Rutherford was killed ; and if they shall also believe that Isham Rutherford gave as the reason why he knew that the said difficulty occurred at the time so testified by him, was that his father, the said Anderson Rutherford, owned a clock, and that it was in house at that time, and that he looked at the clock before he started with his father to the place of said difficulty.  And if they shall also believe that said witness wilfully swore falsely in this behalf, then such false testimony or swearing of said witness vitiated and destroyed the whole of his evidence, and the same should be disregarded by the jury."

We are of opinion that this instruction does not correctly propound the law, and that the court did not err in refusing it.

The jury is the sole judge of the credibility of witnesses, and to have given the instruction would have been to invade the rightful province of the jury.

For the errors hereinbefore pointed out the judgment of the circuit court must be reversed and annulled, the verdict of the jury set aside, and the cause remanded to said circuit court for a new trial, to be had therein in accordance with the views expressed in this opinion.

JUDGMENT REVERSED.