# DENNY SWAN v. STATE.

No. A-2552.   Opinion Filed June 16, 1917.

(165 Pac. 627.)

1. **HOMICIDE—Self-Defense—Intent.** An instruction given by the court which charges the jury, "If you believe that the defendant armed himself and sought the deceased for the purpose of provoking and engaging in a difficulty, and in furtherance of such plan did invite and provoke a difficulty, and then and there shot and killed his adversary, the defendant cannot invoke the rights of self-defense," is fundamentally wrong. The difficulty must be prepared for, sought and provoked for the purpose of and with the intent upon the part of accused to take the life of his adversary. It is therefore necessary for the court, in submitting a charge of this character, to place the burden of the instruction upon the intent of the defendant at the time.

2. **HOMICIDE—Instructions—Degrees—Evidence.** When there is no evidence which directly or indirectly raises the issue of negligent homicide or manslaughter in the second degree, instructions submitting the question of guilt or innocence of this crime should not be included in the charge of the court in submitting the issues to the jury. The charge of the court should give the law applicable to the issues raised by the pleadings and the facts.

*Appeal from District Court, Stephens County;*
*Cham Jones, Judge.*

Denny Swan was convicted of manslaughter in the second degree, and appeals. Reversed.

*Womack & Brown, H. H. Brown,* and *A. K. Swan,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J.   The plaintiff in error, Denny Swan, was tried in the district court of Stephens county on a charge of murder and convicted of manslaughter in the second degree. His punishment was fixed at two years in the state penitentiary. To reverse this judgment an appeal was duly brought to this court.

The evidence discloses the fact that Denny Swan, the plaintiff in error, and Bill Hodge, the deceased, were farmers and were engaged in the stock business in a small way; they lived in the same neighborhood near Ara, in Stephens county; they had been friends for some years; a few weeks before the homicide ill feeling had grown up between them. They lived on adjoining farms and each had complained against the other on account of depredations stock had committed against their growing crops. Other matters also entered into the estrangement. State's witness O. L. Turner was a farmer and stockman who lived in the same community. He had rented a pasture from Swan. On the day of the homicide Hodge drove a number of cattle out of his field on to land of Swan, and met Turner, who told him the cattle did not belong there. Swan came up and spoke to witness, and after a short conversation, turned to the deceased, Hodge, and said, "What the hell are you doing throwing those cattle over here on me?" Hodge replied that he thought they belonged to him. Swan made a sharp reply, which was not understood by the witness. Hodge answered by saying that Swan's cow had been depredating on him. Swan replied that he had yoked her, and deceased replied, "You did, but you were a long time about it." A few words more were passed between the two, and Swan said, "You God damned fellows have been punching me around a long time." Hodge replied, "What the hell have we been punching you about?" Swan said, "You accused me of horse stealing and a little of everything." Hodge replied, "You damn sure did steal a horse." Swan said, "I did not steal any horse." Hodge said that he did and he knew it. Swan said they had been trying to give him dirt a long time, but could not find anything to give him

dirt about. Hodge said, "You have been gambling here a long time." Swan said, "Yes, by God, you have, too," and Hodge said something about turning him in for it,, and Swan said, "You would have to turn state's evidence if you did." Swan then complained that Hodge's hogs had been bothering him. Hodge said that his hogs had not been over there; that those were his neighbors' hogs. Swan said Hodge was a damned liar. They were about ten feet apart at the time. When Swan called Hodge a damned liar, Hodge did not say anything, but reached back as if to draw a gun. Witness saw the handle of the same plainly. It was a black handle. He put his hand on it. Swan leaned over and said, "What are you going to do?" and stepped back and shot. When the shot was. fired Hodge's horse turned around, as did the horse of the witness. It seems both were on horseback. When witness looked around Hodge was falling off his horse. Swan was standing about where he was when he shot. Four or five shots were fired rapidly, so rapidly that the witness could not indicate how fast. He said he did not believe he could clap his hands as fast as the shots were fired. He rode up where Hodge had fallen and asked if he was hurt, but received no answer. About the time Hodge fell from his horse, Swan said, "Now try to make another gun play, God damn you." Witness told Swan he was going to get some one there, and Swan told him to get whom he pleased.

Witness Stewart testified that he lived in the neighborhood and that he went to the scene of the homicide and examined the body for wounds; that there were five wounds, one shot through the arm into the body and two through the body; that he found a pistol five steps east of where the body lay; that it was a 38-caliber Colt with

a black handle, lying on the ground with the right side up and cocked; that there was mud between the hammer and where the hammer goes in to shoot, and some mud on the handle; that it did not look like any one had both-ered it; that it was lying just like it fell; that the ground was soft and it had been raining; that he saw no tracks around the scene of the killing and saw no imprints of shoes or boots.

Sam Sherrell testified for the state:

That he was working about 190 steps from where the homicide occurred; that he saw deceased and Turner there on horseback; that he did not see Swan until after the shooting, and when the shooting took place, he ran up there and went to within 30 steps of them, turned around the corner of the fence, and went to the house; that he was afoot and running; that he saw the deceased fall from the horse. "Q. Describe to the jury how he fell? A. I will describe it just like I seen it. When the shooting was over I didn't know for a minute whether anybody was shot or not, because Hodge never fell off of his horse until the horse had taken a few steps down the fence. His horse turned and started off in a walk. He dropped his bridle reins that way. He went a little bit forward, his foot came out of the stirrup, his hand came back this way, and he went off backward. I saw the body when I got some closer to where it was. His head was right due east; he was on his side; his face turned north. I never went out there, never heard Turner say anything. When I first seen Swan he was standing there. Q. Did you hear him say anything else? A. Yes, sir. Q. What was it? A. Well, sir, I seen Denny Swan, if he is the man that killed Will Hodge, the man that shot Will Hodge off of his horse, deliberately walk up to him, take his hand here, and folded his coat back, or held the scabbard in its place and taken something off of him, and turned to Turner and said, 'Why the hell don't you go on?' Turner jerked his horse and kicked him, and turned his horse

southeast. Denny walked and throwed that pistol down there, and says, 'Damn you, take that.' Gentlemen, that is the truth. Meantime Turner turned right around up the fence up to the house, up to the gate. Turner rode out on the west side of the body. Denny holloed to him, 'Is he dead?' Turner said, 'I think he is.' Denny says, 'That is all right if he is dead.' Mrs. Swan was at her mother's."

On cross-examination the witness testified that the defendant never had said anything to him about Hodge; that he had never threatened him in any way or said anything about the matter; that he did not see him to talk with him until after the examining trial; that he was in jail and he could not see him. He admitted that he told a different story at the examining trial and identified the statement that he gave the county attorney before the examining trial, which is as follows:

"I saw some men walking about 300 yards away, but could hear nothing, heard shots, saw Hodge fall off horse, saw gun go back from his right hand. Flavious Hodge forbade me coming up there; worked for Swan's father. Denny telephoned have dinner ready for him and another man, about dinner that day."

The substance of this witness's testimony at the examining trial is as follows:

"I was working in a clearing 290 steps away from where the killing occurred. I saw only two men on horses until the shooting was over. I heard the shooting. I saw Hodge fall off his horse. He fell back over his horse's hips. The horse turned this way, and he fell that way. I went to the house as quick as I could. I found Swan at the house. When I got there I found Denny telephoning. I said, 'Where are you going?' He said, 'I am going to Duncan.' Did not talk to Swan's folks that day, but did that night. I was terribly excited. I saw what I took to

be a pistol fall to the ground. I did not go to the body; I went along the road close by a little while before it was taken up, his head was pointed to the east, and saw out east of his head what I took to be a gun."

On redirect examination he said:

"I was 290 steps away from the killing. I went up tolerably close to the body. As I went up to the house, Turner rode out there from the gate, and I asked him what it was. I got in about 40 steps of the body. Turner had rode out on the west side of it. Q. Are you going to swear that you saw a gun in that man's hand? A. Yes, sir."

A few other witnesses testified to matters of minor importance.

At the close of the state's testimony a demurrer to the evidence was interposed and a motion to advise the jury to render a verdict of not guilty was filed. Both were overruled and exceptions saved.

A number of witnesses testified in behalf of the defendant to facts tending to establish ill feeling between plaintiff in error and the deceased, the condition of the ground at the scene of the homicide, and the wounds on the body of the deceased. There was practically no conflict in this respect.

The plaintiff in error testified for himself:

That he was 35 years old; that he had lived in the community 12 or 13 years on a farm there; that on the day of the homicide he saw Turner riding in the pasture about 100 yards away from his house, talking to some one; that when he got out in the yard he saw it was Hodge with him; that he went out to where they were and spoke to them; that after some conversation he asked Hodge if the cattle had been breaking in on him, and he said they had, and witness asked him what he was going

to do with them, and he said he brought them up to throw them in, and witness asked him what he was going to throw them in there for, and he said "that there was no son of a bitch's cattle going to eat up his crop, and I told him that my cattle had not bothered him, and he said I had a cow that had been breaking in on him, and I told him, 'Yes; but I had yoked her,' and he said, 'You did, but you have been a long time about it,' and there was something said about the cattle belonging in there, and I said, 'You fellows have been punching me around a long time,' and he said, 'What for?' and I said, 'You accused me of stealing a horse,' and he said, 'Yes; we did accuse you of it, and you stole it, and you know it,' and something was said about gambling and I told him he was threatening to have me arrested for gambling, and he said, 'Yes; you have been gambling a long time, but you are going to get the worst of it this time,' and I told him that if he turned me in he would have to turn state's evidence, that I had never gambled that he knew of unless he was with me at the time, and I told him that these cattle he claimed had been breaking in on him were Turner's and Humphrey's, that I had sold my stalk field to them, and I didn't want their cattle herd-lawed, and he said, 'I don't want to herd-law Turner's and Humphrey's cattle; your cattle are the cattle I am after,' and I said, 'If that is the case, it doesn't make any difference because this cow I put the yoke on belongs to Turner, and I only had control of her,' and he said, 'If that is the fact, you lied to me.' Then I told him his hogs had been over there, they had been in the yard, and on the porch, and one of them had overturned a churn setting on the gallery, and broke it, and he said they were not his hogs and I called him a damned liar. Q. What did he do? A. He was sitting in this position, he was facing me, and he was on his horse, and as I called him a damned liar he reached his hand back this way, and at the same time he reached his hand back I leaned around like this, I had my hands up like this, and I leaned around that way and seen the gun he had hold of, and I stepped back this way,

grabbed my gun, and shot him. Before I shot him I asked him what he was going to do. He made no reply. When I fired it throwed me in a position I would be with this gentleman here, maybe a little further, and as I shot my gun I did not realize the time it was taking, and when my gun was empty his horse had jumped to the fence and had whirled west, and as he run down the fence Hodge came back over his horse and fell over his right hip to the ground. Q. Why did you shoot Hodge? A. Because when he reached for his gun I felt that my life was in danger, and I did it to protect myself. Yes; I saw his gun, the handle of it when he laid his hand on it. I had seen him with a gun on divers occasions before that, and knew that he was in the habit of carrying one. George Rennie had told me of the threat Hodge had made about unloading his official gun in me before that. That was about Thanksgiving Day, the latter part of November. I could not say how long it took me to shoot my gun empty; a man might count two or three. Q. Do you know what Hodge was doing when you went to get your gun? A. He had his hand on it trying to pull it out. I thought he was going to kill me. I had my gun in my right pants pocket. I was in my shirt sleeves. Q. In that conversation down there before the shooting, did Hodge curse you any? A. He called me a horse thief, and a liar, and intimated that I was a son of a bitch. When the shooting was over I turned and walked back to the house. In the meantime Turner rode around the corner of the fence and up to the gate, and I cut across and went up to where he and Hodge were. I had a conversation with Turner, I says, 'Shorty, what would you have done if it had been you?' and he said, 'I would not want anybody shooting at me.' I did not pick the pistol up nor make a statement that I did, nor that it was cocked. I saw the pistol. I noticed that the pistol was cocked. I did not go to Hodge's body nor disturb it in any way nor take anything out of his pockets. Q. What else did you tell Turner, if anything, when you got back to the house? A. I told him to go and notify Hodge's folks, and told him how to go."

Witness further said that he knew where the thicket was that Sam Sherrell was working at; that it was south of where the killing occurred, acoss a ten-acre block of land, 220 yards, and about 40 yards further south; that he never made the remark to Turner about going on that Sherrell testified to, or anything like it; that he had never done anything to Sherrell to intimidate him, never talked to him about his testimony in the case, did not see him after the shooting, until after he testified at the examining trial; that he was in jail 14 days from the time he gave up.

On cross-examination witness testified in substance:

"Hodge and I never had any trouble until about 30 days before the killing. That came up when he thought I had hired his hand away from him. He sent for me, and I went down to his house. He said he wanted to tell me that he had it in for me and was going to punch me. After that we had a talk about a horse collar, and he said, 'The less you come about here, the better it will be for you.' I said, 'All right,' and told him to stay off my place."

There was also proof of violent threats having been made by the deceased against the plaintiff in error. The state offered in rebuttal evidence that the plaintiff in error had also made hostile statements against deceased.

The first assignment of error we shall consider is based upon the contention that the court erred in giving instruction No. 15, which instruction is as follows:

"You are further instructed, gentlemen of the jury, actual or positive danger is not indispensable to justify self-defense. The law considers that men threatened with danger are obliged to judge from appearances and determine therefrom the exact condition surrounding them, and if in such case, judging from the standpoint of the

defendant, a person acts from an honest conviction induced by reasonable evidence, he will not be held criminally for a mistake as to the actual danger.

"However, you are further instructed, gentlemen of the jury, that the right of self-defense is defensive, and not offensive, and no man may by his lawless act create a necessity for acting in self-defense, and thereupon assault and kill his adversary, and then invoke the right of self-defense.

"And therefore, gentlemen of the jury, if from the evidence in this case you should believe that this defendant armed himself and sought the deceased for the purpose of provoking and engaging in a difficulty, and in furtherance of such plan did invite and provoke a difficulty, and then and there shot and killed his adversary, the defendant cannot invoke the right of self-defense."

It is argued that there is no testimony tending either directly or from circumstances to show that the defendant armed himself for the occasion and sought the deceased for any purpose, much less to enter a quarrel with him and kill him, and that for this reason the instruction should not have been given; that the instruction is so worded as to be argumentative and unfair.

Without discussing these features, this instruction is fundamentally wrong, in that the latter paragraph, which is the gist of the same, makes no mention of the intent with which the difficulty must be provoked, and we find no place in the instructions where this defect is cured. The instruction says:

"If you believe that this defendant armed himself and sought the deceased for the purpose of provoking and engaging in a difficulty, and in furtherance of such plan did invite and provoke a difficulty, and then and there shot and killed his adversary, the defendant cannot invoke the right of self-defense."

This is not the law. The difficulty must be prepared for, sought, and provoked for the purpose and with the intent upon the part of the accused to take the life of the deceased or do him great bodily harm.

In *Turnbull v. State,* 8 Okla. Cr. 459, 465, 128 Pac. 743, 746, we said:

"When, in the trial of a person charged with murder, it becomes necessary for the trial court to instruct the jury on the doctrine of seeking or provoking the difficulty, and the proof discloses that the accused did any act or thing which he had a right to do, which could be reasonably considered by the jury to come within the general terms of the court's charge, it is necessary for the court to tell the jury what acts under the law would be justifiable, and discriminate as to acts unlawful and which would deprive him of the right of self-defense, leaving to the jury to determine whether or not, under the facts and the law, the acts [complained of] were lawful or otherwise."

In the same opinion we quoted from the Tennessee case of *Foutch v. State,* 95 Tenn. 711, 34 S. W. 423, 45 L. R. A. 687. We cannot improve upon the clear enunciation of the court in the Foutch Case, and therefore quote fully and adopt the following therefrom:

"In order to make a man guilty of murder, who is the 'aggressor' or in 'fault,' or who 'provokes a difficulty' in which his adversary is killed, he must have provoked it with the intent to kill his adversary, or do him great bodily harm, or to afford him a pretext for wreaking his malice upon his adversary. * * * In order to deny to such party the right to rely on the plea of self-defense, it must appear that he was the 'aggressor' or 'in fault' or 'provoked the difficulty' in such way and with such intent as the law contemplates in the use of these terms. It is not every 'aggression' which produces a difficulty that is an unlawful one within the meaning of this phrase, nor

is it every 'fault' which a man might commit that precludes him from defending himself when violently assaulted or menaced, nor is it every 'provocation of a difficulty' which robs him of the right of self-defense. Cases already cited and hereinafter cited illustrate the true meaning and show the sense in which these words must be understood. They are really intended to imply the same thing, and what they do mean may be best indicated by suggestion of some things they do not mean, taking them up separately. First, as to the 'aggressor': It is not intended that every one shall be held in law to be an 'aggressor' who says something provoking to another which does cause a difficulty, for oftentimes such an 'aggression' is a just one, and sometimes a necessary one; but, even when it is neither just nor necessary, the use of opprobrious language to another is not for this reason alone an 'aggression,' in the sense of the law, for no mere words, however opprobrious, will justify an assault, or the overt menace of an assault; and hence, if one only uses such words, and is assaulted or so menaced, he may defend himself; and the same thing is true of one in 'fault.' He might be in such and other supposable 'fault,' and yet not be deprived of a like right of self-defense; as, though one has threatened or abused him, he cannot go to him and assault him for it. So, when he uses to another opprobrious words, that other cannot assault him or menace him by overt act of violence, and deny him the right of defense. As to 'provoking a difficulty': It is not every provocation, just or unjust, which he may offer that will justify an assault upon him, or the menace of one from which he cannot defend himself; and to this also the limitations as to mere words used apply. After all, the 'aggression,' the 'fault,' or the 'provocation' depends upon its character and its intent. If it is an assault, or the menace of one by an overt act, or the provocation of a difficulty with intent to inflict death or great bodily harm in the event it is resisted, made of malice to bring about that result and enable the provoking party to wreak his vengeance upon the assailant, that is an 'aggression' or

'fault' and a 'provoking of a difficulty' within the legal sense and meaning of the terms. If the 'combat is provoked,' or 'the occasion to kill is produced,' in the language of the charge, on this account, with this intent, and for this purpose, defendant cannot rely upon the plea of self-defense; otherwise he can. * * *"

See *Aldridge v. State,* 59 Miss. 250; *Cartwright v. State,* 14 Tex. App. 486; *State v. Perigo,* 70 Iowa, 657, 28 N. W. 452; *Cotton v. State,* 31 Miss. 504; *Hash v. Com.,* 88 Va. 172, 13 S. E. 398.

The proof in this case discloses the fact that this homicide occurred upon the premises of the plaintiff in error; that the deceased was a trespasser in his pasture and driving stock into the same unlawfully; that the plaintiff in error had a right to be where he was; and that under the particular circumstances had a right to remonstrate with the deceased for turning the herd of cattle into his premises. It was vital to his defense that the jury be instructed properly on this proposition. To use the broad language of the court and leave out all question of the intent would practically be saying to the jury that if the plaintiff in error, by word or act, started the harsh conversation shown, he had lost his right of self-defense. There can be no question but that the plaintiff in error had a right to complain of Hodge for turning the cattle in on him and for being on the premises himself. The controversy began with just such complaint having been made, and the rapid exchange of bitter remarks which followed merged into the homicide. It therefore was necessary for the court to put the burden of this instruction upon the intent of the accused at the time and to protect him with a proper instruction explaining

to the jury how far he might lawfully go under the circumstances before forfeiting the right of self-defense.

The next assignment complained of is based upon the action of the court in submitting an instruction on manslaughter in the second degree over the objection and exception of the defendant.

A careful reading of the evidence discloses the fact that there is not a single element of manslaughter in the second degree in this case. The court had no right to submit that issue, and it was error so to do. It is the duty of the courts in trying homicide cases to distinguish under the evidence the degrees of homicide disclosed, and submit only such as the testimony tends reasonably to establish. The instruction of the court should be such that the jury in its wisdom could arrive at the proper determination of the legal issues. When there is no element of manslaughter disclosed by the proof, the court should not give an instruction defining or submitting such issue. The giving of this instruction in this case would be sufficient warrant for the reversal of this judgment. *Weatherholt v. State*, 9 Okla. Cr. 161, 131 Pac. 185; *Ballard v. State*, 12 Okla. Cr. 277, 154 Pac. 1197. If there is evidence, even though slight, tending to establish manslaughter in the second degree, a reversal would not necessarily follow.

The only remaining assignment which we deem it necessary to refer to is based upon the improper conduct and argument of the special prosecutor. There are nine separate assignments in this connection. We do not feel called upon to enter into an extensive discussion of these assignments. Suffice it to say that, in our judgment, the fair and impartial trial contemplated by law could not

reasonably be expected to result when conduct such as is complained of and disclosed by the record is indulged in.

It is the duty of the trial courts to confine counsel to proper and legitimate channels, and to so conduct the trial that animosity on the part of the officers of the court should have no weight in determining the great issues involved in a capital case.

The judgment is reversed, and the cause remanded, with directions to grant a new trial.

DOYLE, P. J., and MATSON, J., concur.